[Civ. No. 11547.   Third Dist.   Apr. 16, 1969.]

IRENE PEACOCK, as Executrix, etc., et al., Plaintiffs and Appellants, v. COUNTY OF SACRAMENTO, Defendant and Appellant.

Gale & Goldstein and Stanley J. Gale for Plaintiffs and Appellants.

John B. Heinrich, County Counsel, and Thomas A. Darling, Deputy County Counsel, for Defendant and Appellant.

JANES, J.—This is an appeal by defendant county from a judgment for plaintiffs in an action brought on the theory of inverse condemnation.[1] Plaintiffs have filed a cross-appeal from that part of the judgment which found the taking to have occurred on November 13, 1963, but have requested that the cross-appeal be dismissed if the judgment appealed from by the county is affirmed. The trial was bifurcated as to the following issues: (1) whether a taking by inverse condemnation had in fact occurred, and (2) damages. The issue on the main appeal is primarily whether the court correctly found a taking—permanent in nature—to have occurred; we are not concerned with the issue of valuation.

## I. *Background*

The action is based on a claim by plaintiffs that the county through a series of acts deprived plaintiffs of the use and

---

[1]The original plaintiffs were L. J. Reese and J. W. Peacock. Mr. Peacock died after judgment was entered and his widow, Irene Peacock, acting as executrix of his estate, has been substituted as a plaintiff.

value of certain real property located immediately south of Phoenix Field, a privately owned airport in the northeast area of Sacramento County. The evidence was in conflict as to the size of the area involved; the court ultimately determined, however, that the affected parcel, herein referred to as the "take" area, encompassed 26½ acres.

The controversy centers upon the impact on plaintiffs' property rights of a series of actions taken by the Sacramento County Board of Supervisors, which actions were based upon what was initially an assumption and subsequently became a publicly stated intention that the county would eventually purchase Phoenix Field for use as a public aviation facility. The "take" area with which we are concerned was included in that additional property which the county would have had to purchase in order to operate the facility in accordance with their expressed plans. The activities of the board, involved in this case, commenced in 1958 and had not been concluded at. the time the subject proceeding was initiated.

In 1955 plaintiff Reese, the owner of a large tract of land which extended south from Sunset Avenue (the existing boundary of Phoenix Field) to the American River, entered into an agreement with plaintiff Peacock for sale of the property, in successive phases. Peacock's purchase and subsequent development started with the southernmost portion of this property, followed by generally contiguous sections to the north. His plan was to develop the property immediately south of the airport last, because of its potential commercial value once the area south of it was developed. Development of the "take" area was in the planning stages by 1959; subdivision maps had been prepared, the county engineer's office had been contacted regarding sewer facility commitments and arrangements had been made regarding the bonding of improvements.

In 1958, however, the county had entered into an agreement with Leigh-Fisher and Associates, airport consultants, authorizing (1) an analysis of the then existing air trade characteristics of the area and (2) recommendations for an area civil airport development program. The Leigh-Fisher report was published in 1959, and, although it was concerned primarily with the concept of a new metropolitan airport, it included recommendations for "a county-wide system of [smaller] county airports to serve all the aviation needs of the community." The report expressed the need for a permanent public airport facility in the northeast area of the county, and

recommended that primary consideration be given the possible use of Phoenix Field to serve that need. It was further pointed out by the report that Phoenix Field was situated in a rapidly developing residential area and the recommendation was made that the county take immediate action "to provide compatible land uses and maintain proper approach criteria . . . ." suggesting the use of zoning regulations as a method of implementing this purpose.

After the Leigh-Fisher report was submitted to the board of supervisors in 1959, a joint city-county airport study committee was formed to review the report and its recommendations. In January 1960, the study committee adopted a resolution recommending that the county assume responsibility for airport development in line with the recommendations of the Leigh-Fisher report, and in March 1960, that resolution was ratified by the board of supervisors. Hearings were held by the board of supervisors, looking toward adoption of zoning measures to control further development of the area necessary for Phoenix Field expansion, and Mr. Peacock and his attorney attended several such hearings and protested the intended zoning restrictions.

On April 6, 1960, the board of supervisors adopted Ordinance 697, which by its terms applied only to ". . . the airport commonly known as Phoenix Field." The effect of the ordinance was to establish requirements in regard to clear airspace for the existing runway. The ordinance prohibited any structure or vegetation with a height in excess of zero feet in an area extending 200 feet from either end of the runway. A clear airspace requirement of 20:1, or 1 foot of elevation for 20 feet of distance was established for the next 10,000 feet of land, i.e., at 200 feet from the end of the "ground zero" zone, no structure was permitted in excess of 10 feet; any excess would constitute an "obstruction." The county considered this ratio to be required by "TSO-N18" (Technical Standard Order, U.S. Dept. of Commerce) for compliance with certain federal standards with which the county sought to comply in order to be eligible for participation of federal funds. Contemporaneously with enactment of Ordinance 697 the county entered into a lease-leaseback agreement with the private owners of Phoenix Field in order to create the public interest in the airport necessary to qualify for eligible federal funds. Thereafter the sub-lessee, the Fair Oaks Flying Club, operated the airport as a public facility.

By the time Ordinance 697 was adopted, the county had

become aware of the need to acquire an interest in the adjacent clear zones and land area in order to qualify for participating federal funds; after enactment of the ordinance the county prepared various plans for development of the Phoenix Field project which were concerned with both the facility itself and the surrounding area, including recommendations for acquisition of nearby lands, and it repeatedly made clear its intention to purchase the necessary additional land. The plans were not limited to the existing facility, but also included plans for development of various two-runway systems, and the area of clear space required for the several plans prepared varied from one plan to another.

On June 12, 1963, the board of supervisors rezoned certain property in the area of Phoenix Field, including the subject "take" area, from an agricultural classification designated A-I-C to a different agricultural classification known as A-I-B. Although the A-I-B classification permitted a greater density of use for residential purposes (one single family home per acre as opposed to one for each two acres under the A-I-C classification), the A-I-B zoning was slightly more restrictive in certain areas of height regulation than Ordinance 697, and was a type of zoning specifically designed for use in airport and airport approach areas. Although directed by the board of supervisors (under the authority of Ordinance 697) to initiate proceedings for adoption of an airport approach zoning ordinance pursuant to the Airport Approaches Zoning Law of the State of California,[2] the county planning director attempted to accomplish the desired result by the zoning reclassification. This zoning, or any other height restrictive or protective scheme, was not adopted relative to any other private airport in the county.

Finally, in November of 1963, a general Phoenix Field Land Use Plan was submitted to the board of supervisors for approval and the plan was adopted by the board on November 13, 1963. The future airport contemplated by the general plan of November 1963 was a two-runway field involving a clear area greater than that established by Ordinance 697.[3] By resolution passed on February 10, 1964, the board of supervisors directed the taking of necessary steps to effectuate the general plan.

_____

[2] (Gov. Code, §§ 50485-50485.14.)

[3] Because the various study plans and proposals varied slightly as to the alignment of the clear area, there was some confusion as to the exact area required. The trial court, in its judgment, selected the area delineated by the county in this general plan as the area of the actual take.

Negotiations thereupon commenced for purchase of both the airport site and the "take" area. The county's plans became less certain, however, toward the end of 1964 and beginning of 1965, because of difficulty in reaching an agreement as to price with the members of the Fair Oaks Flying Club, owners of the field proper, and on March 24, 1965, the board took action, upon recommendation of its director of airports, to instruct the county executive and other responsible county officers (1) "to take the necessary steps to cancel the existing lease between the County and the Fair Oaks Flying Club relative to Phoenix Field. . . ." (2) "to prepare an ordinance rescinding the height ordinance [Ordinance 697] previously adopted by the Board of Supervisors for Phoenix Field. . . ." (3) "to initiate action and the necessary public hearings for the deletion of Phoenix Field from the General Plan of the County. . . ." and (4) to direct . . . "Public works to continue to look for sites in the area." The order of March 24, 1965, was temporarily suspended, however, by action of the board on April 7, 1965, in order to permit the City-County Chamber of Commerce to assist in purchase negotiations for the field. This "moratorium" on the abandonment order was continued for an additional 60 days by action of the board on June 2, 1965. On September 13, 1965 the board confirmed its intention to abandon the Phoenix Field project and ordered that the steps previously directed be taken.

During the period of time expended by the county in the foregoing acts and planning—commencing with authorization of the Leigh-Fisher report and ending essentially with the filing of this action in October of 1964—plaintiffs have been frustrated in the economic development of their remaining property in that they have been unable to obtain approval of any subdivision maps because of the prospective effect of the entire Phoenix Field project. Early attempts to acquire sewer commitments were unsuccessful because of the uncertain nature of the airport development. Plaintiffs were unable throughout the entire period to obtain information from the county as to the boundaries of the proposed project, although they were assured repeatedly that the lines would soon be fixed and that the land involved in the airport development would be purchased by the county. Property taxes were raised substantially, although plaintiffs were unable to use the property; they were told this would be taken into consideration at the time of purchase.

Mr. Peacock submitted a subdivision map in July 1962,

which proposed the development of 69 lots. The map was rejected and Peacock consulted with the planning director in an effort to prepare an acceptable map. He was told that all the land in the area was "frozen" until the county determined how much land it needed for the airport project. Although the 69-lot subdivision did not include any land within the clear zone required under Ordinance 697, the planning commission ultimately rejected the map, on September 11, 1962, its report stating that the proposed subdivision "would be in conflict with prospective public development" of Phoenix Field, and further, that it did not allow for a proposed relocation of Sunset Avenue. Prior to receipt of the rejection plaintiffs' engineer had prepared a new proposal for the same subdivision, but consisting of 41 lots, and conforming to the proposed road changes. This map was submitted in October 1962, but was also rejected. A third subdivision map was conditionally approved, the conditions imposed by the planning commission resulting in a net of 25 lots. However, the cost of sewer connections, which would have been initially absorbed by the larger number of lots, was now to be apportioned to only 25, and the plan was considered economically unfeasible. Road alignments involved also remained in a state of flux and the subdivision was not pursued. Timely appeal was taken to the board of supervisors from the actions of the planning commission, but the planning action was upheld as a policy decision necessary for protection of the proposed Phoenix Field Project, and plaintiffs' subdivision was disapproved. Mr. Peacock was repeatedly told by various county officials and several members of the board of supervisors that he should not bring a threatened suit in inverse condemnation because the county fully intended to purchase the subject property.[4] This evidence was received for the limited purpose of demonstrating that the county was equitably estopped from asserting a defense of limitations.[5]

Plaintiffs then filed their present complaint, alleging that the effect of the enactment of Ordinance 697, and subsequent actions and enactments by the county, has been to so restrict

[4]The board of supervisors was aware that another property owner in the Phoenix Field area had successfully prosecuted an inverse condemnation suit against the county.

[5]Government Code section 911.2, formerly Code of Civil Procedure, section 715. The point is not of major significance, since a claim was filed against the county in August of 1964, less than one year after the date of taking as determined by the trial court, and the court found an estoppel to exist.

the useable height of their land that the property affected has been permanently taken and damaged, without compensation, contrary to the provisions of the California Constitution, article I, section 14. The pretrial order framed the issues as follows:

"1. Did the action of the defendant cause injury or damage to the subject property for which plaintiffs are entitled to compensation?

"2. Has defendant taken the property by inverse condemnation?

"3. What is the take or valuation date?

"4. What is the measure of damages?

"5. What are the damage and compensation to be awarded?

Prior to trial the order was amended to include the issues of defense of limitations and estoppel to plead such defense. The first phase of the action (the phase involved in this appeal) was terminated by the issuance of an interlocutory decree of inverse comdemnation, and the court made extensive findings. We summarize those relevant to this appeal.

## II. *The Findings*

County Ordinance 697, enacted May 5, 1960, was a height restriction ordinance enacted pursuant to the Airport Approaches Zoning Act (Gov. Code, §§ 50485-50485.14); said ordinance provided for clear zones and areas wherein vegetation could not be grown or any structure erected, and its effect as to plaintiffs was to deprive them of the beneficial use of portions of their property, in that it prohibited them from growing any vegetation or erecting any structures thereon, although airspace above their property was used by the general public.

The lease-leaseback agreement between the county and the Fair Oaks Flying Club created a public interest in Phoenix Field, which continued during the period of county study regarding the location and development of a publicly owned facility and pending completion of study plans concerning such facility as part of a comprehensive overall aviation plan of the defendant county. Said agreement was executed in connection with adoption of Ordinance 697 to maintain the status quo of land uses in the area, pending completion of such studies, and was still in effect at the time of trial.

During the period between May 5, 1960, and November 13, 1963, the county, through its appropriate officials, affirmatively prevented plaintiffs from making normal, logical subdivision use of their property in extension of their adjoining

prior subdivisions, which uses would have been permitted but for the restrictive provisions of said ordinance, the restrictive zoning of A-I-B classification and the proposed development plans of Phoenix Field.

Ordinance 697 was an interim study ordinance and was not repealed by the A-I-B rezoning of June 12, 1963. A-I-B zoning is a specific type of zoning designed for land adjacent to airports, but was not applied to land adjacent to any other private airport in the county. The land configuration of this zoning was identical with the configuration of the land to be acquired by the county under the general plan of November 13, 1963.

By the enactment of Ordinance 697 and the zoning of said property as A-I-B, "the County intended to and did, in fact, maintain the status quo and use of the property as unimproved lands and prevent the development thereof and the construction of improvements thereon during the study period. By such acts the County intended to prevent any increase of cost in the acquisition of the said lands between the time of the enactment of the ordinance and such time as the County would be ready to acquire or purchase the subject property. Absent such restrictive regulation zoning, the County recognized that the subject property would probably be developed with residential units and at the time that the County would be ready to acquire the property, the cost of acquisition would increase because of the improvements that would have been normally constructed upon the subject property. By such actions the County of Sacramento intended to, and in fact did, prevent any development of the subject property, deprive the plaintiffs of any beneficial use of their property, and maintain the status quo thereof during the period from the enactment of Ordinance 697 until the present time."

Acquisition of a public interest in and to the Field, the clear zones, and the approach zones, and the "take" area was a necessary and integral part of the total county project since the plan would not have qualified for federal fund participation in the absence of some such interest. Application for such participation was made. Administrative officials were instructed to implement the county's plan, and pursuant thereto negotiations for purchase of such areas were carried on through 1964 until the latter part of that year, at which time the county withdrew from negotiations and declared a

moratorium on the expenditure of funds previously budgeted for the purchase of Phoenix Field and the "take" area.

On November 13, 1963, the county enacted a general plan for Phoenix Field and the surrounding area with the intent to culminate and complete the study plans begun under Ordinance 697 (section 5 of which provided for a permanent enactment) and further affirmed continuance of the public use of the field and the restrictive use limitations of the ordinance and zoning previously imposed. Ordinance 697 was merged into the general plan and supplanted by it, but the restrictive effect on plaintiffs' land continued, in addition to further restrictive measures contained in the general plan. The period between enactment of Ordinance 697 on May 5, 1960, and adoption of the general plan on November 13, 1963, was a reasonable time for the County to complete its study under the interim provisions of Ordinance 697.[6] The adoption of the restrictive provisions of the general plan, however, and continuation of the previous restrictions thereby regarding the use of the land after November 13, 1963, "was unreasonable, a deprivation of due process, and a compensatory restriction upon the use of plaintiffs' lands."

Under the authority of Ordinance 697, the rezoning of June 12, 1963, and the general plan of November 13, 1963, "the defendant and its officers committed various acts evidencing their intention and position that the Phoenix Field Project was in existence and that the prohibitory provisions of said enactments applied to plaintiffs' lands, all of which deprived plaintiffs of any practical, substantial or beneficial use thereof."

"The exceptional and extraordinary circumstances heretofore enumerated culminating in the adoption of the general plan of November 13, 1963, constituted a take of the subject property by inverse condemnation" by the county

---

[6]At the time of enactment of Ordinance 697, Government Code section 65806 provided:

"§ 65806. If the planning commission, or the department of planning, in good faith, is conducting or intends to conduct studies within a reasonable time for the purpose of, or holding a hearing for the purpose of, or has held a hearing and has recommended to the legislative body the adoption of any zoning ordinance or amendment or addition thereto, or in the event that new territory may be annexed to a city, the legislative body to protect the public safety, health and welfare may adopt as an urgency measure, a temporary interim zoning ordinance prohibiting such and any other uses which may be in conflict with such zoning ordinance." In 1961 this section was amended to provide that such measures could only be effective for one year, unless extended under specified procedures for another year, with a maximum of two such extensions (Stats. 1961, ch. 1871, § 1) but such amendment has been interpreted not to apply retroactively. (39 Ops. Cal.Atty.Gen., p. 241.)

without compensation. By reason of said general plan and the restrictive use and zoning, plaintiffs' land had no practical value or beneficial use to plaintiffs in any manner consistent with its value; the highly oppressive effect of the restrictions was to deny plaintiffs use of their land and to dedicate it to a public use.

Finally the court fixed the date of November 13, 1963, as the date upon which the county took the subject property, finding that the said take was of the fee and not of any lesser interest or easement in or across the property. The boundaries of the "take" area were determined to be those set forth in the county's general plan. The county having negotiated with plaintiffs for the sale and purchase of the "take" area according to the boundaries set forth in the general plan, the court concluded that it was proper and reasonable that the boundaries of the "take" area be defined by said general plan.

Thereupon the court reached conclusions of law generally responsive to the summarized findings of fact, determining that plaintiffs' right to compensation vested absolutely and irrevocably on November 13, 1963, and that "[A]ny act or acts of the defendant which may remove said restrictions or whereby defendant may abandon the public use of said lands shall not divest or deprive plaintiffs of their right to compensation for said taking." The interlocutory judgment was then entered.

### III. *Contentions on Appeal*

The county contends on appeal (1) that none of the three county enactments and actions involved, standing alone, constituted inverse condemnation; (2) that these actions, cumulatively, and the actions of county officials related thereto did not constitute inverse condemnation; (3) that the finding that plaintiffs' property was taken by inverse condemnation is not supported by the fact that two of plaintiffs' subdivision maps were not approved, nor by the evidence indicating that the board of supervisors was aware of or considered the fact that its planning actions would affect the value of the subject property; (4) that the court's finding that Ordinance 697 and the rezoning of June 12, 1963, were done for the purpose of preventing an increase in the value of the property was beyond the power of the court to make, since that issue was not before the court either by the pleadings or the pretrial order; and (5) that if any of the county's actions did consti-

tute inverse condemnation, the "take" was only of a temporary easement in airspace.

## IV. *The Issue of Inverse Condemnation*

Significantly, the trial court did not find that any of the county's enactments or actions, standing alone, constituted inverse condemnation. Rather, the court agreed with the position of the county at trial that Ordinance 697 was enacted as and was an interim study ordinance, and that the period between its enactment and the adoption of the general plan for Phoenix Field was a reasonable time for completion of such study. Nor did the court hold that the rezoning of the property in June of 1963 furnished a basis for relief, although of the five private airports referred to in the Leigh-Fisher reports only property adjacent to Phoenix Field was so reclassified. (See *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454 [327 P.2d 10].) Further, the court did not consider the enactment and adoption of the general plan, *per se*, as constituting inverse condemnation, but reached its conclusion partly on the basis of the continuation of the restrictive measures beyond what was found to be a reasonable time for their existence.

The county's two initial contentions are based in part on the provisions of Public Utilities Code sections 21402 and 21403, which provide that aircraft have a right of flight over land, including the right of flight within the zone of approach of any public airport without restriction or hazard,[7] contend-

---

[7]Public Utilities Code, sections 21402 and 21403, read, at the time of trial, as follows:

"21402. The ownership of the space above the land and waters of this State is vested in the several owners of the surface beneath, subject to the right of flight described in Section 21403. No use shall be made of such airspace which would interfere with such right of flight; provided, that any use of property in conformity with an original zone of approach of an airport shall not be rendered unlawful by reason of a change in such zone of approach.

"§ 21403. (a) Flight in aircraft over the land and waters of this State is lawful, unless at altitudes below those prescribed by federal authority, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. The landing of an aircraft on the land or waters of another, without his consent, is unlawful except in the case of a forced landing. The owner, lessee, or operator of the aircraft is liable, as provided by law, for damages caused by a forced landing.

"(b) The right of flight in aircraft includes the right of safe access to public airports, which includes the right of flight within the zone of approach of any public airport without restriction or hazard. The zone of approach shall conform to the specification of the Technical Standard Order of the Civil Aeronautics Administration of the Department of Commerce designated TSO-N18." (§ 21403 was amended by Stats. 1967, ch. 651, § 1, in respects not here material.)

ing that those sections operated to impose the restrictions of TSO-N18 upon plaintiffs' property at the time the lease-leaseback agreement became operative, and hence that Ordinance 697 was of no additional restrictive effect. The county contends further that even if it is assumed that the restrictions were created by Ordinance 697, rather than by sections 21402 and 21403, such restrictions constituted a valid exercise of the county's planning and zoning powers, as distinguished from an appropriation for public use of a compensable interest in plaintiffs' property.

In *Anderson* v. *Souza* (1952) 38 Cal.2d 825 [243 P.2d 497], however, the court (adopting the opinion of Justice Van Dyke of this court) in speaking of the predecessor to the present Aeronautics Commission Act and the companion federal act (U.S.C.A., title 49, § 176a) stated: " '. . . these declarations were not intended to and do not divest owners of the surface of the soil of their lawful rights incident to ownership.' " (P. 839.) And at page 842 it is stated: " 'The State Aeronautics Commission Act contemplates the furtherance of aviation, with its manifold benefits to the public, by operation of both public and private fields, but with respect to the public fields it provides for their establishment by counties, cities and other municipal agencies, requires the finding of public convenience and necessity and contemplates the use of the power of condemnation.' "

The Airport Approaches Zoning Law (Gov. Code, §§ 50485-50485.14), in relationship to which Ordinance 697 was enacted, also contemplates use of the power of eminent domain in instances where constitutional limitations preclude the use of the zoning power. Further recognition by the Legislature of this limitation is found in Code of Civil Procedure, section 1239.4, which provides: " § 1239.4. Where necessary to protect the approaches of any airport from the encroachment of structures or vegetable life of such a height or character as to interfere with or be hazardous to the use of such airport, land adjacent to, or in the vicinity of, such airport may be acquired under this title by a county, city or airport district reserving to the former owner thereof an irrevocable free license to use and occupy such land for all purposes except the erection or maintenance of structures or the growth or maintenance of vegetable life above a certain prescribed height or may be acquired by a county, city or airport district in fee."

In support of the contention that the county's actions were

a valid exercise of the police power which could not amount to a compensable taking, the county cites *Smith* v. *County of Santa Barbara* (1966) 243 Cal.App.2d 126 [52 Cal.Rptr. 292] and *Harrell's Candy Kitchen, Inc.* v. *Sarasota-Manatee Airport Authority* (Fla. 1959) 111 So.2d 439. The facts of both cases are distinguishable from the instant one. *Smith* upheld as a valid exercise of regulatory power a rezoning of property from residential to design industrial in an area involved in possible airport expansion; the ordinance there, however, merely changed the allowable use of the property rather than to virtually prohibit its use by its owners and to devote it to a public use. In *Harrell's Candy Kitchen, supra,* the constitutionality of airport approach regulations was upheld, hence the case stands generally for the proposition advanced by the county. The regulation there, however, limited use of the subject property to 27.64 feet and plaintiffs desired to use an additional 13.36 feet for an ornamental roof for advertising purposes. The restrictive action of the airport authority was not a denial of any use, such as found by the court in the case at bench, but a limitation still allowing some beneficial use. Further, as noted in *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205, 212 [32 Cal.Rptr. 318] [hearing denied], the Florida case is considered an expression of the minority view in the United States. Cases on the subject, collected in 77 A.L.R.2d 1355 following the leading case of *Ackerman* v. *Port of Seattle* (1960) 55 Wn.2d 400 [348 P.2d 664, 77 A.L.R.2d 1344], declare the majority rule as follows: "§ 3. Zoning ordinances purporting to limit the use of land and regulate the height of structures on land near or surrounding an airport, thus having the effect of granting a free path of airspace over which planes can fly or take off and land at low altitudes, have frequently been held unconstitutional as a 'taking' of private property without just compensation, especially since the governing body could procure the land by eminent domain proceedings." (P. 1362.)

The view expressed finds support in *Sneed, supra,* where it is stated at page 209: "In summary, the zoning law and the zoning ordinance permit elimination of airport hazards in approaches to airports through the exercise of the police power, 'to the extent legally possible' (Gov. Code, § 50485.2); where 'constitutional limitations' prevent the necessary approach protection under the police power, the necessary property right may be acquired by purchase, grant, or condemnation in the manner provided by law.

"While height restriction zoning has long been recognized

as a valid exercise of the police power, there has been a reluctance to extend this method to the protection of approaches to airports; instead, air easements with payment of compensation appear to be the more acceptable, although not undisputed, method of protecting approach zones. (See 13 Hastings L.J. 397, *Airport Zoning and Height Restriction.*)

"We believe there is a distinction between the commonly accepted and traditional height restriction zoning regulations of buildings and zoning of airport approaches in that the latter contemplates actual use of the airspace zoned, by aircraft, whereas in the building cases there is no invasion or trespass to the area above the restricted zone."

In further support of the contention that all three actions—the ordinance, the rezoning and adoption of the general plan—were permissible exercises of the police power, the county cites *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508 [35 Cal.Rptr. 480], and *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710]. *Metro* involved an attack upon an interim ordinance enacted at the request of the planning commission, which had announced its intention to hold hearings upon the proposed adoption of a comprehensive water conservation and development plan. The ordinance was declared to be an emergency measure, required by the pendency of the comprehensive plan. Plaintiff's property was within one of 31 potential reservoir sites, all of which were similarly restricted by the ordinance. The ordinance was a short term measure, limited in duration by the amended provisions of Government Code section 65806.[8] In upholding the validity of the ordinance this court noted the temporary duration of the provisions restricting development of plaintiff's property and pointed out the following significant factors in the evidence: ". . . (1) plaintiff is not being singled out as a lonely object of regulation. The ordinance affects *all* new would-be home subdividers within 31 potential reservoir sites spread throughout the entire county; also (2) the lands here involved have been unused and unusable for generations. They are precipitous or hilly; rocky, brush-covered; (3) there are no subdivisions in the immediate vicinity. An attempt to launch a homesite development on plaintiff's lands would be a pioneering adventure. . . ." (P. 513.)

Recognizing that the police power is not illimitable, we

---

[8]For the text of section 65806, see footnote 6, *supra,* p. 854.

nevertheless found upon the facts there presented that the ordinance in *Metro, supra,* was neither oppressive nor unreasonable, in view of the temporary character of the restrictions placed against plaintiff and others, and after weighing against such hardship the necessity for such temporary restrictions during the evolution of a countywide water plan, we there pointed out that ". . . Reasonableness . . . is the yardstick by which the validity of a zoning ordinance is to be measured and reasonableness in this connection is a matter of degree. A temporary restriction upon land use may be (and we feel is under the facts here) a mere inconvenience where the same restrictions indefinitely prolonged might possibly metamorphize into oppression." (P. 516.)

*Morse, supra,* is equally distinguishable from the instant case. There plaintiffs' complaint alleging that the rezoning of an area in the vicinity of a county airport resulted in inverse condemnation was dismissed after a demurrer was sustained, and the ruling was upheld on appeal. Plaintiffs' property, when purchased by them, was zoned A-1 (agricultural), permitting a density of one residential dwelling per acre. They submitted a subdivision map under a county zoning ordinance which provided that applications for rezoning would be given consideration in relation to the general development of the community. Their map proposed R-1 use, a zoning under which the allowable density would be increased from one to five residential structures per acre. Thereupon the planning commission undertook to review zoning of the entire area in the general vicinity of the county airport, and after a public hearing the commission recommended and the board of supervisors acted to decrease rather than increase the allowable density of the area to A-1-5, a classification which required five acres for a single-family dwelling. Unlike the case at bench, the new zoning appropriated no airspace above plaintiffs' property nor did it create any restrictions upon height; nor in the opinion of the appellate court did it attempt to anticipate condemnation by spot-zoning. ". . . So far as the pleadings disclose, the reclassification neither resulted in the use of plaintiffs' airspace for public purposes nor did it take away plaintiffs' right to continue the existing use of the property." (P. 604.) The case stands for no more than the proposition that the facts there pleaded by plaintiffs showed only that the rezoning ordinance was a proper regulation of land use, rather than a device for taking plaintiffs' property.

In distinguishing *Sneed* v. *County of Riverside, supra,* 218

Cal.App.2d 205, the *Morse* court clearly demonstrates the applicability of *Sneed* to the case presently before us:

"Plaintiffs cite *Sneed* v. *County of Riverside*, 218 Cal.App. 2d 205 [32 Cal.Rptr. 318], in support of their argument that this rezoning constituted a taking of private property for public use without compensation. In *Sneed*, the County of Riverside enacted an ordinance imposing height restrictions on all structures on certain property, the effect of which was to create an easement in the airspace above plaintiff's property for use as an approach zone to the county airport. Under the ordinance the maximum height limits on Sneed's land directly adjoining the runway had been lowered to four feet, less than the height of existing structures on the land. Large numbers of aircraft took off and landed at the airport by flying at low altitudes over his property. The basic issue, according to the court, was whether the Riverside ordinance was a height-limit ordinance authorized by the police power or whether in reality it created an air easement over plaintiff's property without the payment of compensation. After distinguishing between municipal regulations which restrict or destroy certain rights indigenous to the private ownership of property (noncompensable losses) and regulations which transfer those rights to public enjoyment (compensable takings), the court concluded that a regulation which lowers the height of existing buildings within the approach patterns of an airport contemplates a public use of airspace above private land in effect an air easement, for which compensation must be paid. . . ." (*Morse* v. *County of San Luis Obispo, supra,* 247 Cal.App.2d 600, 603-604.)

The county contends—independently of the effect of Ordinance 697 and the rezoning of the area—that enactment of the general plan of November 1963 furnished no basis for a finding that plaintiffs' property was taken in inverse condemnation. The court, however, made no such singular finding. The evidence of its cumulative effect with the other county enactments, considered in relation to acts of the county's officers administering the various restrictive provisions, contributed to the court's determination of a taking. The court found the actions of the county to be reasonable up to a point in time determined to be November 13. 1963; the actions of the county in continuing the restrictions beyond that date were found to be unreasonable and oppressive, constituting a compensable taking of plaintiffs' land. The finding has substantial support in the record as a whole. The evidence discloses much confu-

sion and uncertainty upon the part of various county officers, as well as several members of the board of supervisors as to the meaning and effect of the "clear" zones established by the official documents in evidence and as to the boundaries of the proposed airport project. Patently erroneous interpretations were at times made by county officers upon the question whether in specified clear zones all vegetation and structures were prohibited from ground level or only above the excess height limitations prescribed by Ordinance 697. The impact on plaintiffs' land—in the phraseology of a county officer—was to "freeze" development of any meaningful kind within the area determined by the court to have been taken, and such action by the county's representatives was confirmed and ratified by "policy decisions" of the board of supervisors in rejecting plaintiffs' plans for subdivision development in that part of their land in which under the terms of the ordinance itself building obstructions would have been permitted to a height substantially above "zero" or ground level. The trial judge undoubtedly looked to this evidence of action by the county as well as its officers as supportive of the finding—with which we agree—that plaintiffs were denied any practical or beneficial use of their affected property.

Nor are we persuaded, under the facts presented, by the suggestion that plaintiffs were required first to seek judicial review, under section 11525 of the Business and Professions Code, of the decisions denying their proposed subdivisions.[9] *Kirschke* v. *City of Houston* (Tex.Civ.App. 1959) 330 S.W.2d 629, cited by the county, is distinguishable from the instant case. *Kirschke* involved the denial of a building permit by the city based upon an anticipated need for plaintiffs' property for highway purposes. In affirming a judgment after demurrer sustained to a complaint sounding in inverse condemnation, the Texas court pointed out that plaintiffs should have sought relief by mandamus or mandatory injunction, as the city was not liable in damages because denial of the permit was an exercise of the governmental function and had not resulted in any taking or damage to plaintiffs' property. The complaint attacked in *Kirschke,* however, showed plainly not only that there had yet been no highway construction, but ". . . no lines or boundaries [were] established, no ordinance passed, no money appropriated and no set-backs required."

---

[9] The provisions for judicial review of subdivision determinations were revised and placed in Business and Professions Code, section 11525.1 in 1965. (Stats. 1965, chs. 1180 and 1341.)

(P. 633.) Moreover, contrary to the findings we review in the instant case, the acts complained of did not, in that court's view, amount to a taking. (See *Frusluck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 370-371 [28 Cal.Rptr. 357]; *Sneed* v. *County of Riverside, supra,* at p. 212.)

We allude but briefly to the county's contention that the finding of a taking by inverse condemnation is unsupported by the fact that the two subdivisions were disapproved or by the evidence indicating awareness and consideration by the board of supervisors of the fact that its planning actions would affect the value of the property. The thrust of the argument is really directed to the propriety of the inferences to be drawn from that evidence, and the rule requiring resolution of conflicting inferences on appeal in support of the judgment below is dispositive of this contention. (3 Witkin, Cal. Procedure (1954) Appeal, § 88, pp. 2251-2252.) The attack upon the finding that the ordinance and rezoning were adopted for the purpose of depressing or preventing an increase of value in plaintiffs' property is equally undeterminative of this appeal. That neither the pleadings nor the pretrial order framed such an issue is now of little consequence. The evidence itself was relevant to the question whether the purpose of the enactments was to maintain the "status quo," itself a proper subject of inquiry, and the facts set forth in the questioned finding were therefore relevant and material to the issues pleaded.

### V. *Extent of the "Take"—Easement or Fee?*

Finally, it is the contention of the county—relying upon *Pacific Telephone etc. Co.* v. *Eshleman* (1913) 166 Cal. 640 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A. N.S. 652], and *Sneed* v. *County of Riverside, supra,* 218 Cal.App.2d 205 —that if a compensable taking did occur it was merely temporary in nature and only of an easement in airspace. The *Eshleman* case, however, does no more than demonstrate the principle, on dissimilar facts, that a taking may be of less than the fee interest in property (p. 664), while *Sneed* illustrates, at no advantage to the county, the difference between the taking therein and that found in the case at bench. As pointed out in the report of *Sneed* (at p. 207) the interest allegedly taken from plaintiff there consisted in terms of an air navigation easement over his property, the easement ranging from 4 feet in height at that part of his property closest to the airport to a height of 75 feet at that farthest away. No

question arose as to the extent of the interest taken, but only as to whether plaintiff's complaint stated a cause of action for relief. That it did, and effectively, is shown by our excerpts from the case.[10] The actual extent of the easement, and the mode of valuation, were left for trial.

While the taking which occurs as a result of inverse condemnation may be only temporary, and may in a given situation involve substantially less than the taking of a fee interest in property, we are satisfied, under the exceptional circumstances shown in the instant case, that the evidence properly supports the finding of the trial judge that the interest taken was the fee. Earlier in this opinion we have indicated our own observation that the terms "clear zone" and "clear area" were sometimes misunderstood and upon other occasions interpreted by officials of the county in different ways with reference to the areas of airspace required by Ordinance 697 to be kept unencumbered. Their goal of keeping the approach areas of the proposed airport "clear" of any obstructions pending determination of boundaries, approach patterns, roadways, and other facilities inherent in the project brought about a restrictive interpretation of the regulation which, as the record shows, frustrated the efforts of plaintiffs to develop their property by the logical extension of their subdivisions. It is shown by the record that at one relevant period plaintiffs were even told by a county representative that they could not construct a golf course in the "frozen" area, as the "flags" would not be permitted to extend above the putting greens. It is no answer to suggest that the ordinance and zoning provisions could not be in such manner modified or effectively interpreted by mere officers of the county, as a number of county supervisors expressed the same views, and the board of supervisors itself, in officially denying plaintiffs' appeals from denial of their subdivision applications, ratified the acts of their officers and decided that as a matter of policy no subdivision development would be permitted in the affected area which tended to conflict with the proposed airport in its planning stages. The trial court took pains to point out that there was at no time any question of bad faith or wilful procrastination upon the part of the supervisors or other county officers; they were simply faced with many important budgetary and other fundamental planning problems relating to the project, which at times seemed and eventually turned out to be insuperable. Meanwhile, however, plaintiffs were

---

[10]See pages 858, 859, *supra*.

deprived totally of the economic use of their property within the "take" area, as the court found.

Related to the basic question of the extent of the interest taken is the charge by the county that the trial court abused its discretion in denying the county's motions for continuance, in the stages of the proceeding approaching trial, at a time when the question of abandonment of the project was then before the board of supervisors. However, the county had before it the question of possible abandonment of the project for many months in advance of the trial date. On March 24, 1965, the board took its first formal action to abandon the project, although this initial move was suspended a few weeks later to permit further negotiation with the Fair Oaks Flying Club for purchase of their interests. On June 2, 1965, this "moratorium" on abandonment was continued for an additional 60 days and it was not until September of 1965 that the board finally confirmed its intention to abandon the entire project.

Meanwhile the case had been pretried on March 10, 1965, and the trial date fixed at July 7, 1965. Thereafter, on June 10, 1965, the court modified its pretrial order to provide that:

". . . the trial shall then proceed or shall proceed at such later time to which it is reasonably continued by the trial judge. . . .

"The purpose of this order is to allow the County of Sacramento sufficient time to take action which may affect the issue of what damages and compensation are to be awarded without penalizing plaintiffs by delaying the trial of the other issues here involved which, in the Court's view, do not rest on what future action may or may not be taken by the County."

When finally called for trial on July 12, 1965, the county's motion for a continuance was denied. There was no abuse of discretion. The county had had several years to prepare for trial. Plaintiffs had many times before filing suit expressed their intention to bring an inverse condemnation suit, and each time they were requested by county officers or county supervisors to defer their suit until the county's plans were fully developed in order that the county could purchase the property. Plaintiffs had several times acceded to such requests. The county was aware that the previously mentioned inverse condemnation suit involving property similarly situated had been successfully prosecuted. Denial of the motion for continuance was not an abuse of discretion. "The factors

which influence the granting or denial of a continuance in any particular case are so varied that the trial judge must necessarily exercise a broad discretion.'' (2 Witkin, Cal. Procedure (1954) Trial, § 20, pp. 1746-1747.)

Pursuant to their stated request, the cross-appeal by plaintiffs is dismissed. The judgment is affirmed. Plaintiffs-respondents are to recover costs on appeal.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied May 15, 1969.