[Civ. No. 18651. Fourth Dist., Div. One. Oct. 9, 1980.]

RANCHO LA COSTA, Plaintiff and Respondent, v.
COUNTY OF SAN DIEGO, Defendant and Appellant.

[black redaction bars]

COUNSEL

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Cameron Reeves, Deputy County Counsel, for Defendant and Appellant.

William M. Boyd, Linda Breeden, T. Roy Gorman, John Bremner, Janet G. Tulk and Nancy Wainwright as Amici Curiae on behalf of Defendant and Appellant.

Musick, Peeler & Garrett, Donald J. Drew and Kenneth A. Holland for Plaintiff and Respondent.

OPINION

COLOGNE, Acting P. J.—The County of San Diego (County) appeals the judgment awarding Rancho La Costa (R.L.C.) damages for inverse condemnation in allegedly taking land for public park purposes. The trial had been bifurcated and the judge sitting without a jury made a finding the County had taken R.L.C.'s property without due process of law under the California and United States Constitutions, and further found the affirmative defenses were without merit. In the second phase of the trial, a jury awarded damages exceeding $6 million.

R.L.C. is a limited partnership owning approximately 1,980 acres. The property subject of this action consists of approximately 440 acres north of La Costa Avenue and west of El Camino Real, described in this action as "parcel A," 200 acres of which are in and around the

Batiquitos Lagoon, and 240 acres of which are situated north of that lagoon.

All of parcel A and most of the rest of the property involved in this action was zoned A-1-8, indicating it is an agricultural zone which allows no more than one dwelling unit for each eight acres.

In 1961, R.L.C. retained the engineers' firm of Moffatt and Nichol who prepared a feasibility study for the development of Batiquitos Lagoon. Their studies, together with a later master plan prepared by Rick Engineering, concluded it was physically and economically feasible to develop the lagoon as a recreational facility surrounded by commercial and residential development. To accommodate that plan, however, it would be necessary to secure an increased elevation of the bridge which the state Division of Highways was building over the lagoon.

As a result of these studies and the willingness of the state and the County to participate, R.L.C. ultimately paid the County $70,442.25, and it in turn contracted with the state to raise the bridge to the appropriate elevation.

The General Plan of the San Dieguito area adopted on September 5, 1967, included the subject property but did not show a regional park in that area. The San Diego General Plan, 1990 (General Plan 1990) adopted three months later, however, did propose a regional park at Batiquitos Lagoon on the privately owned property. Under this plan, the land use designation applicable to the subject property was medium low residential density allowing .75 to 3.3 dwelling units per acre. Though this plan remains in effect, zoning has not been changed to conform.

In 1969 or earlier, the board informally adopted a policy that the planning department would not accept applications for rezoning or for special use permits with respect to the subject property, and R.L.C. was advised of that policy. R.L.C. made no application for any changes, having concluded it would be an idle act.

In December 1970, the County caused to have prepared a Regional Parks Implementation Study (RPIS) in order to establish an implementation plan for General Plan 1990. The RPIS final report included the subject area as a proposed regional park having a high priority for completion. The report was accepted by the board on April 19, 1972, and

requested (1) the planning commission to initiate hearings to include this in the General Plan 1990, (2) the chief administrative officer to propose a financial program to acquire and develop all the parks and (3) the public works agency to initiate a precise plan of acquisition and development of the parks.

After April 19, 1972, the County entered into negotiations to acquire a 7.33-acre parcel of state-owned property adjacent to Interstate 5 west of this general area, the land having been declared surplus by the state. It was within the boundaries of the proposed Batiquitos Lagoon Regional Park.

On May 24, 1972, R.L.C. filed an application to annex all the R.L.C. property to the City of Carlsbad, the city having earlier stated it would not consider serving the area with city services, including sewer services, absent annexation. The County planning department advised the Local Agency Formation Commission (LAFCO) that Batiquitos Lagoon was shown on the County General Plan 1990 as a regional park and recommended that none of the property be annexed to the city. The two supervisors who served on LAFCO also played an active role in opposing the annexation. On November 14, 1972, pursuant to a recommendation of the County public works administrator in connection with the proposed purchase of the 7.33-acre surplus state property, the board adopted a resolution indicating it did not anticipate approval of any further rezoning that would be incompatible with the proposed regional park. The opposition to annexation by the County was found by the trial court to be "a material and procuring cause" for LAFCO's deletion of two parcels including the subject property from the proposed annexation. LAFCO staff recommended the annexation be denied and further that the regional park area be deleted from any future city annexation or incorporation proposal. By a six-to-zero vote, denial of annexation of parcel A occurred on October 2 and December 5, 1972. LAFCO approved annexation of the more northerly parcel B owned by R.L.C.

The trial court found the board of supervisors at all material times "pursued its policy of blocking any economic, beneficial use of Parcel A in order to ensure it could be acquired by [the County] as cheaply as possible."

From an economic point of view, it is apparent R.L.C. had to contract with the City of Carlsbad to obtain city services if it wanted to put

together any sort of subdivision of this property. Carlsbad was the only entity capable of supplying these urban services. R.L.C. asserted, and the trial court found as a result of County's action, it was deprived of all reasonable, beneficial use of parcel A and the severance of that beneficial use affected the value of parcel B. A claim against the County for this taking was filed and rejected. This action ensued.

■ At issue is whether the County by its actions effected a "taking" as contemplated by such inverse condemnation cases as *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], and *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391]. In holding it did not, we find it unnecessary to address all the issues raised by this appeal.

■ In order to state a cause of action in inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]).

■ Public entities are not bound to reimburse individuals for losses due to changes in zoning, for within the limits of the police powers some hardships must be borne by individuals as the price of living in a modern, enlightened and progressive community. Further, landowners have no vested right in existing or anticipated zoning ordinances. (*HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 516 [125 Cal.Rptr. 365, 542 P.2d 237]; *Morse* v. *County of San Luis Obispo* (1967) 247 Cal. App.2d 600, 602 [55 Cal.Rptr. 710].) ■ If it can be said the adoption of General Plan 1990 changed the zone of R.L.C.'s property, it did not constitute a taking of a vested right. In any event, such a change would only serve R.L.C.'s advantage allowing medium low residential density (.75 to 3.3 dwelling units per acre) as opposed to an agricultural use (1 dwelling unit per 8 acres). This could only increase the value. There could be no damage.

The adoption of a general plan is a legislative act and is by its nature tentative and subject to change. ■ The enactment of a general plan for future development of an area indicating potential public use of privately owned land does not amount to inverse condemnation (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 119).

The Legislature has authorized such long range plans, including specific plans (Gov. Code, § 65450 et seq.)[1] and district plans (§ 66105 et seq.) for orderly community growth. ■ So long as the County has not placed obstacles in the path of the property owners in the use of their land or has not refused permission to build or subdivide the property, there is no taking merely in the act of adopting the plan (*Selby, supra*, at p. 120). Thus the acceptance of the general plan or the RPIS or the request to staff for physical and financial feasibility studies is no more than planning and does not affect the landowners' interest. The planning and construction of regional parks of this size require a substantial amount of work, and to hold the announcement of the plan or the initiation of the feasibility studies results in inverse condemnation of properties designated for ultimate acquisition would result in forced purchase of property before it was determined to be economically feasible; it would severely hamper government's ability to provide any such programs (*Smith v. State of California* (1975) 50 Cal.App.3d 529, 536-537 [123 Cal.Rptr. 745]).

In *Navajo Terminals, Inc. v. San Francisco Bay Conservation etc. Com* (1975) 46 Cal.App.3d 1, 3 [120 Cal.Rptr. 108], the court held the adoption of a resolution "fixing and establishing within the shoreline band the boundaries of water-oriented priority land uses" according to a general plan pertaining to the whole of San Francisco Bay and its shoreline adopted pursuant to state law (§§ 66600, 66602), does not constitute a taking for which the property owner is entitled to damages.

The California Supreme Court, as late as March 1979, in *Agins v. City of Tiburon*, 24 Cal.3d 266, at pages 275 to 276 [157 Cal.Rptr. 372, 598 P.2d 25], said: "[T]he...abstract principles under the force of experience have coalesced into a specific functional requirement. Community planners must be permitted the flexibility which their work requires. As we ourselves have recently observed, 'If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land.' [Citing *Selby, supra*, 10 Cal.3d 110, at p. 120.]

"...'This threat of unanticipated financial liability will intimidate legislative bodies and will discourage the implementation of strict

---

[1]Unless otherwise indicated, all section references are to the Government Code.

or innovative planning measures in favor of measures which are less stringent, more traditional, and fiscally safe.' (Hall, *Eldrige* v. *City of Palo Alto: Aberration or New Direction in Land Use Law?* (1977) 28 Hastings L.J. 1569, 1597.)" (*Agins* v. *City of Tiburon, supra,* at pp. 275-276.)

*Agins* involved a low density, open space zoning modification in connection with the city's preparation of a general plan. As a result, the property owners could build a maximum of five one-family dwellings on their five acres of prime hilltop, bayview land. The court in *Agins* held no inverse condemnation remedy attended the ordinance changes.

While it is true an action for inverse condemnation has to be permitted where a public entity has engaged in inequitable precondemnation activity, the cases which have sustained such liability have been ones where the public entity publicly expresses the intention to pursue acquisition of the property. (See *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, where the city commenced eminent domain proceedings and then abandoned the announced plan nevertheless stating it intended to acquire the precise parcel.) Similarly in *Peacock* v. *County of Sacramento, supra,* 271 Cal.App.2d 845, the county refused the owner permission to develop land near an airport which the county had announced its intention to develop, assuring the owner it was of no consequence since it intended to purchase the land.

The freedom with which local government may exercise its functions particularly in the area of zoning, was recently affirmed by the United States Supreme Court in *Agins* v. *City of Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], which upheld the judgment of the California Supreme Court in the same case, *supra.* Our highest court said, in part (447 U.S. 255, 261-263 [65 L.Ed.2d 106, 112-113, 100 S.Ct. 2138, 2142-2143]): ". . . . The specific zoning regulations at issue are exercises of the city's police power to protect the residents of Tiburon from the ill-effects of urbanization. [Fn. omitted.] Such governmental purposes long have been recognized as legitimate. . . .

". . . . . . . . . . . . . . . . . .

". . . Appellants therefore will share with other owners the benefits and burdens of the city's exercise of its police power. In assessing the

fairness of the zoning ordinance, these benefits must be considered along with any diminution in market value that the appellants might suffer.

"Although the ordinances limit development, they neither prevent the best use of appellants' land, see *United States* v. *Causby*, 328 U.S. 256, 262, and n. 7, 66 S.Ct. 1062, 1066, . . . nor extinguish a fundamental attribute of ownership, see *Kaiser Aetna* v. *United States*, 444 U.S., at 179-180, 100 S.Ct., at 393 . . . . [T]he appellants are free to pursue their reasonable investment expectations by submitting a development plan to local officials. Thus, it cannot be said that the impact of general land-use regulations has denied appellants the 'justice and fairness' guaranteed by the Fifth and Fourteenth Amendments. See *Penn Central Transp. Co.* v. *New York City*, 438 U.S., at 124, 98 S.Ct., at 2659." And in a footnote, the court declared: "Appellants also claim that the city's precondemnation activities constitute a taking. See nn. 1, 3, and 5, *supra.* The State Supreme Court correctly rejected the contention that the municipality's goodfaith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. [Citation.] Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' [Citations.]"

Finally, we must consider whether the County's role in opposing annexation of R.L.C. property to the City of Carlsbad constituted a taking. Having concluded this property should be included in the general plan as a regional park, the County had an interest in seeing that the plan was followed in an orderly manner. We know of no authority which gives a property owner a vested right to have his property included within the boundaries of any particular city, district or authority. The prospect one's property might become more valuable if it is annexed to the city where certain special services are available at a more reasonable cost is a pleasant contemplation for a landowner, but it is certainly not a vested right. The County could not and did not restrict development within the limitations of applicable zoning law and the general plan. There was a finding by the trial court the County adopted

an informal policy that the planning department should not accept applications for "rezoning" or for "special use permits." That policy amounted only to a confirmation that existing zoning would be followed without exception. It sought only to continue its jurisdiction over the area so that the development could continue to conform to General Plan 1990. The County had spent considerable amounts of time and money on these studies and planning and it clearly had a real interest in the development of a regional park. The city's interest in such a park was certainly not as pronounced and the city was not in a position to finance such a regional park. Preservation of a general plan and active efforts to continue a contemplated program of public accommodation is a legitimate county function (see *Agins* v. *City of Tiburon, supra*, 447 U.S. 255, 261-263 [65 L.Ed.2d 106, 112-113, 100 S.Ct. 2138, 2142]).

The Local Agency Formation Commission is a separate governmental entity and operates independently of the county or cities which it serves (see generally, § 54773 et seq.). Its purpose, inter alia, is to review and approve or disapprove proposed annexation of territory to cities (§ 54790). In reaching its decision, LAFCO is required to hold public hearings (§ 54793) and consider a number of factors relative to the annexation (§ 54796). Included is the effect of the proposed action as well as alternatives on the cost and adequacy of services and controls in the area and adjacent areas, on mutual social and economic interests, and on the local government structure of the County (§ 54796). The social need for a regional park and the County's superior financing ability are clearly factors to be considered, and it is entirely appropriate for the County to bring this to the attention of LAFCO. To bar it from presenting such information or actively advocating a position opposed to annexation for that reason would inhibit the performance of its solemn duty to serve the best interests of the public.

The makeup of LAFCO, having only two board of supervisors members on the seven-member commission (§ 54780), provides an adequate safeguard for the exercise of independent judgment by LAFCO free of domination by the County. We see nothing improper in the County's action, both through its department heads as well as its elected representatives, bringing to the attention of LAFCO the County's general plan to include this area in a regional park and explaining the amount of work and effort put into the plan so the social and economic interests could be weighed by LAFCO. We cannot view that as inverse condemnation any more than any other planning activity; nor does it constitute

a conflict of interest. The County is not responsible for the independent decision of LAFCO here (see *Meyers* v. *Local Agency Formation Com.* (1973) 34 Cal.App.3d 955, 962 [110 Cal.Rptr. 422]).

The County's activities substantially advance legitimate public goals and do not prohibit development of the R.L.C. property as contemplated by the landowner. Nothing in the County's policy prevents R.L.C. from developing its property in conformance with existing zoning laws,[2] though it must be admitted it would be much more expensive without the services offered by the city. We recognize there is an added burden of supplying such things as water and sewage disposal services which would be required before the property could be developed and this is especially so now since the entry into the picture of the California Coastal Commission. The fact the development is more expensive does not mean there has been a denial of any of the use by the landowner. We know of no authority which would make the burden of increased cost to the property owner alone a basis for holding rezoning or general plan changes effect an inverse condemnation. Similarly, the County's duty to provide its input in annexation hearings should not be denied or burdened with the threat of a claim for inverse condemnation simply because the values to the property owner are greater one way as opposed to the other.

We do not suggest R.L.C., or any other property owner, is without remedy under the conditions presented. As the Supreme Court pointed out in *Agins* v. *City of Tiburon, supra*, 24 Cal.3d 266, at pages 276 to 277: "In combination, the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances."

■ Whether a zoning regulation, general plan or annexation effort by the County is excessive in a particular situation involves questions of degree, turning on the individual facts of each case, but such a local government activity may be held unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property (*Agins* v. *City of Tiburon, supra*, 24

---

[2]The General Plan 1990 adopted by County authorized a greater density of land use than the existing zoning. R.L.C. has a right under law to compel the County to conform the zoning to the General Plan (§ 65860).

Cal.3d 266, 277). ■■■ Neither the zoning ordinance, general plan, annexation procedures, or the informal policies of the County produced that result. Aware of the uses R.L.C. could still make of its property, we can say there was not a taking which amounted to inverse condemnation.

Judgment reversed with directions to dismiss the action.

Staniforth, J., and Wiener, J., concurred.

A petition for a rehearing was denied November 7, 1980, and respondent's petition for a hearing by the Supreme Court was denied December 4, 1980.