G & A LAND, LLC, Jacob J. Dawson, and Betty L. Dawson, Plaintiffs–Appellants,

v.

The CITY OF BRIGHTON, Defendant–Appellee.

No. 08CA2192.

Colorado Court of Appeals, Div. VI.

April 29, 2010.

Fowler, Schimberg & Flanagan, P.C., Timothy J. Flanagan, Katherine Taylor Eubank, Denver, Colorado, for Plaintiffs–Appellants.

Murray Dahl Kuechenmeister & Renaud LLP, M. Patrick Wilson, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge ROTHENBERG.*

In this action against defendant, City of Brighton, plaintiffs G & A Land, LLC, Jacob

---

* Sitting by assignment of the Chief Justice under

provisions of Colo. Const. art. VI, § 5(3), and

J. Dawson, and Betty L. Dawson (Landowners), appeal the trial court's judgment (1) granting Brighton's motion for summary judgment on Landowners' promissory estoppel claim; and (2) granting Brighton's C.R.C.P. 12(b)(5) motion to dismiss Landowners' inverse condemnation and 42 U.S.C. § 1983 claims. We affirm the judgment dismissing the promissory estoppel and § 1983 claims, but reverse it as to the inverse condemnation claim, and we remand for further proceedings on that claim.

## I. Background

In early 2004, Brighton decided to build a new wastewater treatment plant in unincorporated Weld County. For several years thereafter, Brighton engaged in actions and communications with Landowners evidencing its intent to construct the treatment plant on Landowners' properties (the properties), including a resolution passed by the Brighton Council in March 2005 authorizing negotiation and condemnation to acquire the properties. In August 2007, negotiations were still unsuccessful, and Landowners filed this lawsuit alleging, among other things, that Brighton's actions and inactions during the lengthy precondemnation period have deprived them of their right to alienate their properties.

The trial court concluded as a matter of law that Brighton's communications did not constitute an enforceable promise under the doctrine of promissory estoppel, that Landowners' inverse condemnation and § 1983 claims were not ripe because Brighton had not made a final decision regarding Landowners' properties, and that there was no "taking" of Landowners' properties.

## II. Promissory Estoppel Claim

Landowners contend the trial court erred in granting summary judgment to Brighton on their promissory estoppel claim. They maintain that Brighton's announced plans to acquire their properties and its offers to do so constituted a promise on which they reasonably relied. We disagree.

§ 24–51–1105, C.R.S.2009.

## A. Standard of Review

Summary judgment is appropriate when the pleadings and supporting documentation demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c). A material fact is one that will affect the outcome of the case. *GE Life & Annuity Assurance Co. v. Fort Collins Assemblage, Ltd.*, 53 P.3d 703, 706 (Colo.App. 2001). We review the grant of a summary judgment motion de novo. *W. Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo.2002).

The nonmoving party is entitled to any favorable inferences that may reasonably be drawn from the facts, and all doubts must be resolved against the moving party. *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 225–26 (Colo.2001); *Norton v. Leadville Corp.*, 43 Colo.App. 527, 530, 610 P.2d 1348, 1350 (1979).

## B. Applicable Law

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts § 90. *Nelson v. Elway*, 908 P.2d 102, 110 (Colo.1995). It provides relief to those harmed because they relied on another's promises, even without an enforceable contract. *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982).

A prima facie case for relief under the doctrine requires "(1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise." *Nelson*, 908 P.2d at 110.

## C. Requirement of a Promise

In this context, a promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement

(Second) of Contracts § 2(1). "A promise may be stated in words . . . or may be inferred wholly or partly from conduct." *Id.* § 4. But it must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.,* 876 P.2d 112, 114 (Colo.App.1994). It must also be sufficiently definite to allow a court to understand the nature of the obligation. *Soderlun v. Pub. Serv. Co.,* 944 P.2d 616, 620 (Colo. App.1997); *George v. Ute Water Conservancy Dist.,* 950 P.2d 1195, 1199 (Colo.App.1997).

In *Hansen v. GAB Business Services,* a division of this court concluded an employer's compensation plan that included a performance-based bonus did not contain a valid promise because the plan did not clearly and unambiguously obligate the employer to pay the bonuses. 876 P.2d at 114; *see Soderlun,* 944 P.2d at 620–22 (concluding an employer's verbal assurances of continued employment were not promises because they did not contain commitment language). Likewise, in *George v. Ute Water Conservancy District,* 950 P.2d at 1199, a division of this court concluded a personnel manual describing a progressive disciplinary procedure did not constitute a promise to abide by that procedure, because the manual lacked definite commitment language, and it emphasized that employees were terminable at-will.

■ Here, Landowners rely on the following communications and actions taken by Brighton, which they maintain constituted valid promises that Brighton would acquire their properties through negotiation or condemnation. However, we conclude none of these communications or actions was sufficient to create the type of obligation required to support a promissory estoppel claim.

### 1. March 2005 Resolution

In Resolution 05–35, the Brighton Council found Brighton needed to take "immediate possession [of Landowners' properties] . . . for the public health, safety, and welfare, due to bidding and construction deadlines." However, the resolution merely "authorize[d] the Brighton Manager to conduct . . . good faith negotiations" and to "exercise the power of eminent domain." The resolution did not undertake any obligation.

### 2. September 2004 Negotiation Letters

In letters to Landowners, Brighton's attorney stated Brighton's "desire to obtain [Landowners'] propert[ies] through a negotiated settlement," and added that "if this cannot be accomplished in a timely manner, Brighton will have no alternative but to commence appropriate legal proceedings to acquire the [p]ropert[ies]." However, the letters contemplate future bargaining. They do not contain language promising to be bound by the plan. *See George,* 950 P.2d at 1199.

### 3. Treatment Authority's Letter of June 2006

This letter from the Regional Waste Water Treatment Authority was sent to another landowner who is not a party in this case. It expressed the Authority's intent to work with Landowners to begin negotiations on acquisition, stating:

> As an owner of the property that will be used for the siting of the . . . Treatment Plant, the Authority looks forward to working with you in the forthcoming property acquisition activities. . . . Now that [preliminary steps] have been completed, property acquisition procedures will begin [and] [w]e will be in contact with each property owner in the near future to discuss the acquisition schedule and to begin property negotiations.

This letter expressed an intent to begin the negotiation process, but it did not contain a clear and unambiguous promise to acquire Landowners' properties.

### 4. Notice of Intent and Offer Letters of August 2007

Brighton also sent "notice of intent" letters offering to pay for an appraisal at its expense and to purchase Landowners' properties. The letters stated that, after twenty-one days, Brighton would deem the offer rejected and "may initiate eminent domain proceedings to condemn and take the propert[ies] in accordance with law." The letters affirmed Brighton's desire to acquire Landowners' properties and to initiate the statutory condemnation process, which requires the condemnor to offer to pay for an appraisal.

However, they did not include a formal commitment to acquire the properties if Landowners rejected the offer, and Landowners did so. Hence, we conclude Brighton did not legally obligate itself by sending these letters.

### 5. Agent's Statutory Offers in May and June 2004

Brighton's right-of-way agents sent letters to Landowners that offered to pay for an appraisal. Again, however, we conclude the language in these letters was insufficient to show Brighton has an obligation to purchase the properties.

### 6. Brighton's Other Actions

Brighton's other actions included condemning an adjacent parcel for the project, hiring a traffic consultant to determine what improvements would be needed during the development of Landowners' properties, hiring appraisers to value Landowners' properties, performing an environmental site assessment of Landowners' properties, engaging an engineering firm for on-site drilling and soil reports, posting a sign adjacent to Landowners' properties stating that "the property upon which this sign is posted shall be considered for the construction of the Regional Wastewater Treatment Plant," and representing to third parties that Brighton "owned the property."

These actions showed Brighton's interest in acquiring the properties, but did not obligate it to do so. They are nevertheless relevant in assessing Landowners' inverse condemnation claim, and we therefore discuss them below.

### 7. Cumulative Effect of Brighton's Actions

We conclude Brighton's actions and communications, viewed individually and cumulatively, merely expressed its intent to acquire Landowners' properties in the future. Therefore, the trial court did not err in ruling as a matter of law that Landowners failed to establish a valid promise and could not prevail on their claim for promissory estoppel.

### III. Inverse Condemnation and § 1983 Claims

Landowners next contend the trial court erred in dismissing their inverse condemnation and § 1983 claims pursuant to C.R.C.P. 12(b)(5). We agree with Landowners as to the inverse condemnation claim but disagree as to the § 1983 claim.

### A. Standard of Review

We review a trial court's ruling on a motion to dismiss de novo. We accept as true all averments of material fact contained in the complaint and view its allegations in the light most favorable to the plaintiff. *Brossia v. Rick Constr., L.T.D. Liab. Co.*, 81 P.3d 1126, 1129 (Colo.App.2003).

A C.R.C.P. 12(b)(5) motion to dismiss is looked upon with disfavor, and a complaint should not be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts supporting the claim which would entitle the plaintiff to relief. A complaint should not be dismissed for failure to state a claim so long as the plaintiff is entitled to some relief upon any legal theory. *Pub. Serv. Co. v. Van Wyk*, 27 P.3d 377, 385–86 (Colo.2001).

### B. Inverse Condemnation

An inverse condemnation claim derives from the takings clauses of the federal and state constitutions and traditionally allows property owners a remedy when a government entity effects a taking of property for a public purpose without initiating and following formal condemnation proceedings. *Animas Valley Sand & Gravel, Inc. v. Bd. of County Comm'rs*, 38 P.3d 59, 63 (Colo.2001); *Thompson v. City & County of Denver*, 958 P.2d 525, 527 (Colo.App.1998); *Van Wyk v. Pub. Serv. Co.*, 996 P.2d 193, 196 (Colo.App. 1999), *aff'd in part and rev'd in part on other grounds*, 27 P.3d 377 (Colo.2001).

An action for inverse condemnation is based upon article II, section 15 of the Colorado Constitution, which provides, in relevant part, that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." *See City of Northglenn v. Grynberg*, 846 P.2d 175, 178

(Colo.1993). Because an inverse condemnation claim is based upon this "taken or damaged" clause of our constitution, it is tried as if it were an eminent domain proceeding. *Id.*

■ Whether a "taking" has occurred is an issue of law to be decided by the court, *id.*, and we review the question de novo. *People v. Romero,* 953 P.2d 550, 555 (Colo. 1998). The same is true in a "damage clause" case. *But see Animas Valley,* 38 P.3d at 63 (limiting the damage clause in a regulatory taking case to situations in which the damage "is caused by government activity in areas adjacent to the landowner's land").

■ "To establish a claim for inverse condemnation under the Colorado Constitution, a property owner must show that (1) there has been a taking or damaging of a property interest; (2) for a public purpose; (3) without just compensation; (4) by a governmental or public entity that has the power of eminent domain, but which has refused to exercise that power." *Betterview Invs., LLC v. Pub. Serv. Co.,* 198 P.3d 1258, 1262 (Colo.App. 2008) (quoting *Scott v. County of Custer,* 178 P.3d 1240, 1244 (Colo.App.2007)).

However, there need not be a physical taking of the property. The supreme court has explained that, "[a]lthough the concept of a taking may originally have contemplated only physical appropriation, *it is clear today that nonacquisitive governmental action may constitute a taking when the governmental activity substantially impairs an owner's use of the property.*" *Bd. of County Comm'rs v. Flickinger,* 687 P.2d 975, 983 (Colo.1984) (emphasis added); *see Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.,* 176 P.3d 737, 742 (Colo. 2007) ("A de facto taking does not require a physical invasion or appropriation of property. Rather, a substantial deprivation of a property owner's use and enjoyment of his property may, in appropriate circumstances, be found to constitute a 'taking' of that property or of a compensable interest in the property." (quoting 2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.01[15][b] (3d ed. 2006))); *City of Colorado Springs v.*

*Andersen Mahon Enterprises, LLP,* —— P.3d ——, —— (Colo.App.2010) (same).

■ A regulatory taking occurs as follows: Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.

*Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (citing *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

## C. Application to This Case

■ Landowners have not alleged that Brighton has physically encroached on their properties, that they have been denied all economically viable use of their land, or that these circumstances constitute a regulatory taking. Nor have they challenged Brighton's assertion that its actions in locating the new wastewater treatment plant will advance legitimate state interests. Landowners' contention is that Brighton has taken actions that have interfered with their dominion over the properties.

Landowners concede the holding in *Lipson v. Colorado State Department of Highways,* 41 Colo.App. 568, 588 P.2d 390, 391–92 (1978), is damaging to their case. But they contend that *Lipson* was wrongly decided; that it contains no real analysis; that its vitality has been eroded by later cases decided by the Colorado Supreme Court, such as *Flickinger,* 687 P.2d at 983; and that more recent and more persuasive cases from other jurisdictions have allowed recovery in circumstances similar to theirs. They urge us to adopt the holdings of those cases which we discuss in more detail below.

In *Lipson,* the plaintiffs filed a complaint in inverse condemnation alleging that (1) the Colorado Department of Public Highways had determined it would be necessary, desirable, and in the People's best interest if a

portion of the plaintiffs' property were taken for public use for a highway expansion and overpass construction; (2) the highway department had publicized that the overpass would be constructed, which made selling or developing the property impossible; (3) the department had prepared maps showing such construction and had commenced procedures required to obtain necessary permits, approvals, and funding from the federal government; and (4) even though the plaintiffs held the fee ownership, their property had been taken for public use without just compensation. *Lipson*, 41 Colo.App. at 568, 588 P.2d at 391.

The trial court dismissed the complaint, and a division of this court upheld the ruling, reasoning that "the Department of Highways ha[d] made no physical ouster of the owners from the property, and ha[d] not interfered in any way with the owners' power of disposition or use of the property." 41 Colo.App. at 570, 588 P.2d at 392.

The division relied on *City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 903 (1971), which was a case of first impression in New York. There, the court considered "whether there can be a De facto taking absent a physical invasion or the imposition of some direct legal restraint." *Id.* at 899. The New York court stated that a de facto taking "requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property." *Id.* at 903. The court also discussed the public policy considerations involved in the case:

[S]trong public policy considerations prohibit a finding of a De facto taking in the instant case. To hold the date of the Announcement of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a De facto taking at that time, would be to impose an "oppressive" and "unwarranted" burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner.

And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy which "would but raise (greater) havoc with an owner's rights."

*Id.* at 904 (quoting *City of Buffalo v. J.W. Clement Co.*, 34 A.D.2d 24, 311 N.Y.S.2d 98, 114 (N.Y.App.Div.1970) (Gabrielli, J., dissenting)).

The New York court concluded:

[T]he mere announcement of impending condemnations, coupled as it may well be with substantial delay and damage, does not, in the absence of other acts which may be translated into an exercise of dominion and control by the condemning authority, constitute a Taking so as to warrant awarding compensation.

*Id.*

Landowners are correct that cases decided after *Lipson* have concluded a physical "ouster" or appropriation of the property is *not* required and a taking may occur "when the governmental activity substantially impairs an owner's use of the property." *Flickinger*, 687 P.2d at 983. In fact, a division of this court recently revisited *Lipson* in *City of Colorado Springs v. Andersen Mahon Enterprises, LLP*.

There, the owner leased its property in Colorado Springs to a third party (tenant). In late 2004, the city adopted a road-widening project and the owner was notified that it would "potentially" be impacted by the project. After learning of the potential condemnation of the property, the tenant sued the property owner for rescission of the lease, alleging that the owner had fraudulently concealed the road-widening project. The parties settled that dispute in June 2007, and the owner sought a new tenant but was unable to rent the property from June 2007 to March 2008.

In August 2008, the city filed a condemnation petition, and the property owner counterclaimed for inverse condemnation, alleging that the city's delay in acquiring the property constituted a de facto taking and resulted in lost rental income and other expenses. The trial court, relying on *Lipson*, granted the

city's motion to dismiss the counterclaim, pursuant to C.R.C.P. 12(b)(5). It concluded as a matter of law that the city's precondemnation conduct was not a legal interference with the owner's physical use, enjoyment, or power of disposition of its property, that no taking had occurred before the city took possession of the property, and therefore, that the lost rental income from June 2007 to March 2008 was not compensable.

On appeal, the property owner argued that a de facto taking occurred after the city had obtained funding and governmental approvals for the project and had sent the notice of intent to acquire the property, because a "cloud of condemnation hung over" the property, depriving the owner of its ability to lease the property.

The division recognized that a physical appropriation of the property was not required. But it also observed that "the law announced in *Lipson* comports with the weight of authority ... that mere plotting and planning by a governmental body in anticipation of the taking of land for public use, and preliminary steps taken to accomplish this, does not, in itself, constitute a taking." *Andersen Mahon Enterprises,* ⸺ P.3d at ⸺.

> As *Lipson* indicates, a de facto taking requires the condemning authority to do more than plan and prepare for a project; *it must also commit some affirmative act that legally interferes with the property and results in the condemning authority's exercise of dominion and control over the property.* The mere existence of funding and environmental approvals for the project and the issuance of a notice of intent to acquire the property do not automatically result in a de facto taking. At that point, the project still could have been abandoned by the condemnor and the property never actually disturbed.

*Id.* at ⸺ (emphasis added).

Landowners nevertheless maintain that *Lipson* failed to consider the rights of property owners caught in so-called "precondemnation blight" or "precondemnation cloud" situations, when the condemning authority has engaged in "aggravated delay or untoward activity in instituting or continuing the condemnation proceedings." *Clay County*

*Realty Co. v. City of Gladstone,* 254 S.W.3d 859, 869 (Mo.2008). These situations generally have occurred when cities have adopted urban renewal plans and the condemnation proceedings are protracted.

Indeed, a number of jurisdictions have recognized "the whole character of an area may be changed to the detriment of the property owner during the course of the proceedings" and at times the "area has been made a wasteland by the condemning authority." *City of Detroit v. Cassese,* 376 Mich. 311, 136 N.W.2d 896, 900 (1965). In such cases, the courts have concluded the property owner should not be obliged to suffer the reduced value of the property, just as where condemnation proceedings tend to increase the value of property, the property owner is not entitled to the increased value. *Id.*

For example, in *Clay County Realty,* 254 S.W.3d at 869, the landowners' property was declared blighted by the city in May 2003. One year later, the city entered a redevelopment agreement with a developer, but by August 2005, it had withdrawn its designation of the developer and had cancelled the agreement. In October 2005, the city adopted another ordinance designating the property as blighted and approved a plan for the property that provided for the use of eminent domain for economic development.

The landowners filed an action for inverse condemnation, alleging that the city had not yet adopted an ordinance approving the project or specifying the redevelopment that was to occur at the property. The Missouri Supreme Court held that property owners should be allowed to seek compensation for "departure of rental tenants, unmarketability, and declines in rentability, capital values, and profits" when there has been "aggravated delay or untoward activity." 254 S.W.3d at 864. The court recognized that "[i]n a given situation a premature announcement of condemnation may well cast a devastating pall over property in a given area with the end result that by the time a de jure taking occurs the fair market value of the property has become noticeably depressed." *Id.* (quoting *Land Clearance for Redevelopment Authority v. Massood,* 526 S.W.2d 354, 357

(Mo.Ct.App.1975)). The Missouri Supreme Court added:

> This case involves a problem which has plagued the judiciary of this state for some time without satisfactory resolution. It arises with increasing frequency because of redevelopment of metropolitan areas.... Because of the blight designation and the general public knowledge that the property will be acquired for redevelopment, an exodus of tenants ensues, sometimes allegedly encouraged by the redevelopment authority, and no equivalent influx of similar tenants occurs. Often times the property depreciates and deteriorates, the neighborhood declines, vandalism and destruction of the property occurs, and the landowner, anticipating the eventual taking of the property, does not expend money to improve his unproductive asset.

*Id.* at 866–67 (quoting *State v. Gaertner*, 626 S.W.2d 373, 375 (Mo.1982)).

The Missouri court also recognized that some delays relating to condemnation proceedings were natural and unavoidable. Thus, it limited and clarified its holding:

> [B]efore property owners have a viable cause of action for precondemnation damages, they must establish that there has been aggravated delay or untoward activity in instituting or continuing the condemnation proceedings at issue. Without this ... showing of "aggravated delay or untoward activity," every condemnation case would give rise to a separate cause of action based on precondemnation activity, because the condemnation process involves governmental and judicial decisions that are endemic with delays.

*Id.* at 869.

The New York court also acknowledged this problem in *J.W. Clement Co.,* stating:

> [T]here was no appropriation which would permit an award of damages prior to the De jure taking. This, however, is not to say that the aggrieved property owner is without remedy. Indeed, *the aggrieved property owner has a remedy where it would suffer severely diminished compensation because of acts by the condemning authority decreasing the value of the property.* In such cases where true condemna-

tion blight is present, the claimant may introduce evidence of value prior to the onslaught of the "affirmative value-depressing acts" of the authority and compensation shall be based on the value of the property as it would have been at the time of the De jure taking, but for the debilitating threat of condemnation. This, in turn, requires only that there be present some proof of affirmative acts causing a decrease in value and difficulty in arriving at a value using traditional methods.

321 N.Y.S.2d 345, 269 N.E.2d at 905 (citations omitted, emphasis added); *see Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345, 1350–51, 1355, 1360 (1972) (discussing availability of damages for decline in property value caused by "condemnation cloud" resulting after announcement of intent to condemn and recognizing a plaintiff's claim for inverse condemnation based on lost rents following a precondemnation announcement); *Reichs Ford Road Joint Venture v. State Roads Commission,* 388 Md. 500, 880 A.2d 307, 319–20 (2005) (holding that a property owner was entitled to seek compensation in inverse condemnation action for lost rental income and costs of maintaining property caused during fourteen-year delay in condemnation proceedings); *Johnson v. City of Minneapolis,* 667 N.W.2d 109, 115–116 (Minn.2003) (concluding city's precondemnation activities constituted a taking under the state's constitution); *State v. Barsy,* 113 Nev. 712, 941 P.2d 971, 976 (1997) (recognizing a right to recover damages caused by precondemnation activity when extraordinary delay or oppressive conduct by the condemnor has been shown), *overruled on other grounds by GES, Inc. v. Corbitt,* 117 Nev. 265, 21 P.3d 11 (2001); *Lincoln Loan Co. v. State,* 274 Or. 49, 545 P.2d 105, 109–10 (1976) (recognizing a cause of action in inverse condemnation for seeking recovery of alleged condemnation blight damages); *Conroy–Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598, 602 (1974) (recognizing a remedy for a de facto taking where the property owner alleged precondemnation damages); *Luber v. Milwaukee County,* 47 Wis.2d 271, 177 N.W.2d 380, 384 (1970)

(concluding alleged precondemnation damages for loss of rental income deserved compensation under the "just compensation" provision of the state's constitution); *but see DUWA, Inc. v. City of Tempe*, 203 Ariz. 181, 52 P.3d 213, 217 (Ariz.Ct.App.2002) (concluding there was no de facto taking because "Tempe committed no official overt acts of dominion over DUWA's property, nor has DUWA demonstrated that it was ever prohibited from exercising dominion and control over its own property"); *Calhoun v. City of Durant*, 970 P.2d 608, 613 (Okla.Civ.App.1997) (concluding "[p]roposed, but unfulfilled plans to condemn land do not constitute a taking because such plans do not amount to an exercise of dominion and control over the property by the condemning authority and do not prohibit the landowner from exercising dominion and control over his property").

The *Lipson* division relied on *J.W. Clement Co.*, and we assume it did not address the remedy available to property owners arising from "precondemnation cloud" or "blight" because the plaintiffs in *Lipson* did not allege it. Nor did the plaintiffs allege that the Colorado Department of Highway's actions were "aggravated" or that it had engaged in "untoward activity in instituting or continuing the condemnation proceedings," as was alleged in *Clay County Realty*, 254 S.W.3d at 869.

The plaintiffs in *Lipson* merely alleged:

(1) that the Colorado Department of Public Highways had determined that it would be necessary, desirable and to the best interest of the people if a portion of plaintiffs' property be taken for public use in the expansion of South Santa Fe Drive and the construction of an overpass on Belleview over South Santa Fe Drive; (2) that the defendant had publicized that an overpass would be constructed, which has made the sale or development of the property impossible; and (3) that the defendant has prepared maps showing such construction and commenced procedural processes required to obtain the necessary permits, approvals, and funding from the United States Government, and that as a result, even though they still hold the fee ownership, the property of the plaintiffs has been taken for public use without just compensation.

41 Colo.App. at 569, 588 P.2d at 391.

However, the issue *did* arise in *Andersen Mahon Enterprises*, —— P.3d at ——, because the property owner there alleged that, after the city had obtained funding and governmental approvals for the project and had sent the notice of intent to acquire the property, a "cloud of condemnation hung over" the property, thus depriving the owner of its ability to lease the property. *Id.* The division addressed the "blight" cases but concluded they were factually distinguishable because:

Unlike the instant case, *Clay County Realty Co. v. City of Gladstone*, 254 S.W.3d 859 (Mo.2008), involved a condemnation blight action where the plaintiffs' retail shopping center had been declared blighted and made the subject of a redevelopment plan. The plan was later abandoned when the city's agreement with a developer fell through, and subsequently the property was again declared blighted.

*Id.* at ——.

Here, as in *Andersen Mahon Enterprises*, we need not decide whether to adopt the more expansive holdings in the cases relied upon by Landowners because we similarly conclude the facts they have alleged do not raise the type of "condemnation blight" issues that were addressed in *Clay County Realty*, 254 S.W.3d at 868, and other "blight" cases.

To summarize, we agree with the divisions in *Lipson* and *Andersen Mahon Enterprises* that it furthers public policy if a governmental entity is free to announce its intention to acquire private property before filing a petition and serving a summons pursuant to sections 38–1–102 and 38–1–103, C.R.S.2009. It is also inevitable that delays will occur during which property owners may be unable to develop, lease, or sell their properties because of the uncertainty created by the impending condemnation.

■ Therefore, we conclude that damages arising from protracted delay alone are not compensable and that mere plotting and planning do not, without more, amount to an

invasion of property or deprive the owner of the use and enjoyment of the property. *Andersen Mahon Enterprises,* —— P.3d at ——; *Lipson,* 41 Colo.App. at 570, 588 P.2d at 392.

However, the rights of a condemning authority are not unlimited, and we further conclude that Landowners have alleged facts in this case which are distinguishable from both *Lipson* and *Andersen Mahon Enterprises.* They have alleged that (1) Brighton officials have interfered with Landowners' power of disposition or use of their properties by representing to third parties in public meetings involving the proposed water treatment facility that Brighton "already owns" Landowners' properties; and (2) Brighton has posted a sign adjacent to Landowners' properties stating that the new water treatment facility would be built there.

We must accept as true all averments of material fact contained in the complaint and view its allegations in the light most favorable to the plaintiff. *Brossia,* 81 P.3d at 1129. We may not uphold the dismissal of a complaint for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts supporting the claim which would entitle the plaintiff to relief. *Van Wyk,* 27 P.3d at 385–86.

Applying that standard of review, we conclude Landowners have alleged affirmative actions by Brighton *apart from the protracted delay,* which, when construed in the light most favorable to Landowners, could allow a fact finder to determine that Brighton "legally interfered with [Landowners'] propert[ies] and result[ed] in the condemning authority's exercise of dominion and control over the propert[ies]." *Andersen Mahon Enterprises,* —— P.3d at ——.

In reaching our conclusion, we reject Brighton's contention that *Animas Valley* requires another result. That case involved a land use plan and is factually distinguishable, as are the other cases relied upon by Brighton. *See Grynberg,* 846 P.2d at 177 (addressing the acquisition of a surface estate); *Van Wyk,* 996 P.2d at 196; *Jafay v. Bd. of County Comm'rs,* 848 P.2d 892, 901 (Colo.1993) (addressing whether the rezoning of property was a taking without due process or just compensation); *Sellon v. City of Manitou Springs,* 745 P.2d 229, 234 (Colo. 1987) (the plaintiff challenged an ordinance providing for less density on unplatted land than on platted land).

Brighton's reliance on *City of Black Hawk v. Ficke,* 215 P.3d 1129 (Colo.App.2008), is also misplaced. There, the city filed a proceeding to acquire the owners' property to construct a municipal maintenance facility, and obtained a court order for immediate possession of the property. However, after the jury determined that $637,500 was just compensation for the taking, the city sought to abandon the condemnation. Over the owners' objection, the trial court authorized the abandonment but awarded the owners' part of their attorney fees. The issue on appeal was the propriety of those fees. *Id.* at 1131. Thus, *Ficke* offers us no guidance.

We therefore conclude the trial court erred in dismissing Landowners' claim for inverse condemnation.

### D. Ripeness of Inverse Condemnation Claim

The trial court also ruled that, even if Landowners had a viable takings claim, their claim was not ripe until Brighton instituted formal condemnation proceedings or abandoned them. Landowners contend the trial court erred in so ruling, and we agree.

Ripeness requires the presence of an actual controversy between the parties warranting adjudication. *Beauprez v. Avalos,* 42 P.3d 642, 648 (Colo.2002). When an injury is speculative or may not occur, a court "will not consider" it. *Jessee v. Farmers Ins. Exchange,* 147 P.3d 56, 59 (Colo.2006).

Although Brighton contends that an inverse condemnation claim cannot be ripe until the condemning authority has reached a final decision about the subject property, the cases that support this proposition have involved zoning and land use. See *Quaker Court Ltd. Liability Co. v. Bd. of County Comm'rs,* 109 P.3d 1027, 1034 (Colo.App. 2004). The requirement of ripeness in such cases ensures that a reviewing court will not interfere with the condemning authority's process until it has made a final decision that

is adverse to a property owner. *Palazzolo,* 533 U.S. at 621, 121 S.Ct. 2448. The final zoning or land use regulations may not adversely affect a landowner, or the impact may be mild because a waiver or variance is granted or changes favorable to the landowner are made during the adoption process. *Id.* Therefore, in the zoning and land use context, it is appropriate for a court to defer review until a final decision is made.

Here, however, Landowners have alleged that they have already been harmed and continue to be harmed, regardless of how Brighton proceeds in the future, and we must accept as true their allegations and view them in the light most favorable to them. We therefore conclude Landowners' claim is ripe. *See Clay County Realty,* 254 S.W.3d at 870 (concluding property owners' claims for precondemnation blight were ripe for review before condemnation, stating that "[p]roperty [o]wners need not wait until their property is condemned to seek precondemnation damages, as suits can seek awards of damages for harm that is ongoing").

### E. Ripeness of Section 1983 Claim

■ Landowners also contend the trial court erred in dismissing their due process claim under 42 U.S.C. § 1983. We disagree.

In *Miller v. Campbell County,* 945 F.2d 348, 352 (10th Cir.1991), the court stated:

> The Fifth Amendment does not prohibit the government from taking its citizens' property; it merely prohibits the government from taking property without paying just compensation. U.S. Const. amend. V. Before a federal court can properly determine whether the state has violated the Fifth Amendment, the aggrieved property owner must show first that the state deprived him of his property, and second, that the state refused to compensate him for his loss. *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194–97, 105 S.Ct. 3108, 3120–22, 87 L.Ed.2d 126 (1985). In those states that allow aggrieved property owners to bring an inverse condemnation action in order to recover compensation for property taken by the state, a Fifth Amendment takings claim is not ripe until the aggrieved property owner "has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121.

*See First Bet Joint Venture v. City of Central City,* 818 F.Supp. 1409, 1412 (D.Colo. 1993) (concluding a property owner has not suffered a Fifth Amendment violation until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the government for obtaining such compensation).

Here, the trial court dismissed the claim, concluding the relief Landowners seek under § 1983 is coextensive with the relief they seek under their inverse condemnation claim. This was not an appropriate ground for dismissal. Nevertheless, because the inverse condemnation has not been resolved unsuccessfully to Landowners, their § 1983 claim is not ripe, and we may uphold the trial court's ruling on that ground. *See Negron v. Golder,* 111 P.3d 538, 542 (Colo.App.2004) (if the trial court reached the correct result, we may affirm its determination on different grounds).

### IV. Conclusion

The judgment is affirmed as to the dismissal of Landowners' promissory estoppel and § 1983 claims. The judgment is reversed as to the dismissal of their inverse condemnation claim, and the case is remanded for further proceedings on that claim consistent with the views expressed in this opinion.

Judge HAWTHORNE and Judge LICHTENSTEIN concur.