Hillsborough-southern judicial district
No. 2011-095

## J.K.S. REALTY, LLC & a.

### v.

## CITY OF NASHUA

Argued: April 5, 2012
Opinion Issued: October 10, 2012

*Greene Lombardi Law Group, P.L.L.C.*, of Bedford (*Arthur G. Greene* on the brief and orally), and *Prunier & Prolman, P.A.*, of Nashua (*Gerald R. Prunier* on the brief), for the petitioners.

*Office of Corporation Counsel*, of Nashua (*James M. McNamee* on the brief, and *Stephen M. Bennett* orally), for the respondent.

HICKS, J. The petitioners, J.K.S. Realty, LLC and L.J.J. Realty, LLC, appeal a ruling of the Superior Court (*Lynn*, J.) that the respondent, the City of Nashua (City), did not take the petitioners' property by inverse condemnation. We affirm.

The following facts were either found by the trial court, are undisputed by the parties, or are supported in the record. The petitioners are two trusts that own, as tenants in common, a 26.8 acre parcel of land in Nashua (the property). The property was purchased in 1980 for purposes of development or sale to a developer. It is bisected by Baldwin Street, which provides the most feasible access to the property. The northern section of the property abuts railroad tracks. The property is located in the area of the planned Broad Street Parkway (BSP).

The BSP was conceived by the City in the 1970's "to address air quality on Main Street . . . as well as congestion in downtown Nashua and, also, to provide a second river crossing" over the Nashua River. In 1985, the BSP was included in the City's master plan. That same year, an environmental impact study began for an environmental impact statement (EIS), which was required for the BSP to receive federal funding. The EIS was completed in 1997 and the BSP was approved that same year. At that point, it was decided that the New Hampshire Department of Transportation (DOT) would take over the project and manage it on behalf of the City. This was intended to be the final design stage for the BSP and it was expected that the project would be completed in 2004; however, over the next several years various issues arose that resulted in changes to the design and delayed implementation of the project.

Initially, the BSP was to be a four-lane roadway with an at-grade crossing over the adjacent railroad right-of-way, creating what was to be called Sargent Avenue Extension. The proposed Sargent Avenue Extension would have discontinued Baldwin Street and crossed the petitioners' property. As a result, the petitioners were concerned about access to their property because under this plan access would be from the proposed Sargent Avenue Extension, the BSP, or streets located at the southern boundary of the property, which "ha[d] very steep access issues."

While never formalized, it was anticipated that the BSP would require taking a 200-foot right-of-way across the northern portion of the property parallel to the railroad tracks. From 1998 to 2003, many parcels surrounding the property were acquired for the BSP and, in 1998, the petitioners were told that the State might take the entirety of their property in the fall of 1999. However, in early 1999, they learned that the State was unsure as to how much land would be needed for the BSP and whether the petitioners' property would be taken in its entirety.

In or around 2000, the railroad objected to an at-grade crossing and DOT changed the plan to have Sargent Avenue Extension be a "connecter loop" with an above-grade crossing to connect to the BSP. Under this plan, the "connector loop" extended onto a significant portion of the property, which raised the possibility of a total taking of the property. At some point, a dispute arose between the City and DOT as to the plans. In 2003, the plan was again revised to reduce the BSP from four lanes to two lanes and to eliminate the proposed Sargent Avenue Extension and instead retain Baldwin Street with a newly constructed bridge. This plan would allow access to the petitioners' property via Baldwin Street.

In 1983, the petitioners began to have the property rezoned to allow for multi-family development, which was accomplished in January 1985. As a stipulation of the rezoning process, the petitioners dedicated an eighty-foot right-of-way along the northern border of the property for the purposes of the BSP. From 1980 to 1994, the petitioners spent between $82,000 and $127,000 preparing the property for sale.

Since 1998, the petitioners made numerous unsuccessful attempts to sell the property, or a portion thereof, including entering into three separate purchase and sale agreements. At least one of the buyers expressed concern with the topography of the property, including "the narrowness of the site, the wetlands . . . and the 'conservation buffer' along the property line near the residential subdivision." The last purchase and sale agreement was entered into on October 7, 2002, for sale of the entire property at a purchase price of $4,000,000 with a closing in April 2004. At some point, the buyer learned that the City was unsure whether it would take the property for the BSP and asked the petitioners for an extension until he learned what the City intended to do. The petitioners decided to keep the property until it was resolved whether the City was going to take the property and, as a result, the sale did not go through.

Since 2004, the petitioners have not marketed the property. However, they have harvested timber on the property for a profit and there was testimony that, unless prohibited by zoning regulations, the petitioners "would have been able to undertake" building "single-family residences, . . .

conservation subdivisions, modular homes, manufactured homes, elderly housing, commercial uses, and multi-family developments."

In 2009, the petitioners filed a petition for inverse condemnation, requesting that the trial court rule that the City took the property by inverse condemnation on April 10, 2004, and seeking damages, including but not limited to, the fair market value of the property on that date. They alleged that the delays and continuing uncertainty regarding the BSP deprived them of all economically viable use of their property as of April 2004, when the last purchase and sale agreement fell through.

Following a three-day bench trial, the trial court found "that the continuing uncertainty regarding the status of the BSP has [not] been so substantial and prolonged as to rise to the level of a taking." This appeal followed.

As an initial matter, we address the City's motion to dismiss this appeal. The petitioners filed their notice of appeal in early February 2011. The record indicates that, on March 16, 2011, DOT filed a declaration of taking and a $1,315,000 deposit of damages with the New Hampshire Board of Tax and Land Appeals (BTLA) to acquire a portion of the petitioners' property by eminent domain. *See* RSA 498-A:5 (2010). On March 31, the petitioners requested a withdrawal of the deposit of damages and thereafter filed an answer with the BTLA contesting the sufficiency of the damages amount. *See* RSA 498-A:11, III (2010).

The City argues that it is inconsistent for the petitioners to seek damages for a total taking in 2004 in this case while also seeking damages in the BTLA proceeding based on a partial taking in 2010. Relying upon the doctrine of election of remedies, the City maintains that the petitioners "could potentially recover twice for a single alleged wrong" and "should elect one of those remedies, but should not seek both." The petitioners contend that they have elected their remedy by filing the inverse condemnation claim in superior court. As for the BTLA proceeding, they contend that they are merely defendants whose participation is limited to protecting their rights under RSA chapter 498-A.

■ "The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, or to alternative remedies, but to prevent double recoveries or redress for a single wrong." 25 Am. Jur. 2d *Election of Remedies* § 3 (2004) (footnotes omitted). "Its purpose has also been described as preventing a litigant from presenting inconsistent causes of action or testimony before a court." *Id.* It "does not prohibit assertion of multiple causes of action, nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction." *Pa. Nat. Mut. Cas. Ins. Co. v. Pine Bluff*, 354 F.3d 945, 951

(8th Cir. 2004) (citation omitted). Thus, we have "held that the formal doctrine of election of remedies should be confined to cases where the plaintiff may be unjustly enriched or the defendant has actually been misled by the plaintiff's conduct or the result is otherwise inequitable or *res judicata* can be applied." *In re Estate of Ward*, 129 N.H. 4, 10 (1986) (quotation omitted).

None of these circumstances applies to this case. First, unjust enrichment would become relevant only if the petitioners attempted to collect twice on the same cause of action. *Id.* at 11. Here, the petitioners avow that they do not intend to collect twice. They contend that if they prevail in this appeal, the deposit paid to them in the BTLA proceeding would be applied to the damages owed under any inverse condemnation award in this case. They further maintain that if they do not succeed in this appeal, the declaration of taking will proceed before the BTLA and they will be entitled only to damages awarded in that proceeding. Thus, the petitioners are not attempting to collect twice on the same cause of action. Further, the petitioners have not misled the City by accepting the deposit of damages in the declaration of taking proceeding. In both proceedings, the petitioners maintain that the City has taken their property and they are entitled to just compensation. There is no suggestion that the City was unaware that the petitioners withdrew the deposit of damages for the partial taking and are seeking additional compensation before the BTLA. The petitioners' pursuit of this appeal despite accepting the deposit for a partial taking simply reflects their continued belief that they are entitled to compensation for a taking of their entire property. Finally, *res judicata* does not bar this appeal because no final adjudication has occurred in the BTLA proceeding. Accordingly, the City's motion to dismiss is denied. We now turn to the merits of the petitioners' appeal.

We begin by addressing the proper standard of review. On appeal, the City maintains that we should review the trial court's order for an unsustainable exercise of discretion. We disagree. Whether the City's actions are sufficient to constitute a taking is a question of law reviewed *de novo*. *Cf. Arcidi v. Town of Rye*, 150 N.H. 694, 698 (2004). Other jurisdictions apply a similar standard. *See Colorado Springs v. Andersen Mahon Ent.*, 260 P.3d 29, 32 (Colo. Ct. App. 2010); *Fitger Brewing Co. v. State*, 416 N.W.2d 200, 205 (Minn. Ct. App. 1987); *Tarrant Regional Water Dist. v. Gragg*, 43 S.W.3d 609, 615 (Tex. App. 2001), *aff'd*, 151 S.W.3d 546 (Tex. 2004); *Brenner v. New Richmond Regional Airport*, 816 N.W.2d 291, 299 (Wis. 2012). We will defer to the trial court's factual findings, provided there is evidence in the record to support them, but we review its application of

the law to the facts *de novo. See ACAS Acquisitions v. Hobert*, 155 N.H. 381, 400 (2007); *Colorado Springs*, 260 P.3d at 32.

▪ The petitioners argue that the trial court erred under the New Hampshire Constitution and existing case law by ruling that the City did not commit a taking by inverse condemnation. Inverse condemnation occurs when a governmental body takes property in fact but does not formally exercise the power of eminent domain. *Arcidi*, 150 N.H. at 698. When this occurs, the governmental body has committed an unconstitutional taking and the property owner has a cause of action for compensation. *Id.* "Governmental action which substantially interferes with, or deprives a person of, the use of his property in whole or in part, may . . . constitute a taking, even if the land itself is not taken." *Sundell v. Town of New London*, 119 N.H. 839, 845 (1979); *see Eaton v. B.C. & M.R.R.*, 51 N.H. 504, 534 (1872) ("To the extent to which the owner is . . . substantially deprived of its legitimate use, . . . he should be paid." (quotations omitted)); *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945) ("Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.").

> [T]he interference must be more than mere inconvenience or annoyance and must be sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires that the burden imposed be borne by the public and not by the individual alone.

*Sundell*, 119 N.H. at 845 (quotation and ellipsis omitted).

▪ While "[i]nverse condemnation may be effected through either physical act or regulation," *Pennichuck Corp. v. City of Nashua*, 152 N.H. 729, 733 (2005), "[t]he right to recover for inverse condemnation . . . cannot be made to depend upon the means by which the property is taken." *Sundell*, 119 N.H. at 846. "We look to the individual circumstances of each case to determine whether there is an unconstitutional taking." *Allianz Global Risks U.S. Ins. Co. v. State of N.H.*, 161 N.H. 121, 124 (2010) (quotation omitted). The question is one of degree and its resolution is governed by no set test. *Funtown v. Town of Conway*, 127 N.H. 312, 317 (1985). Factual differences in each case will affect the determination of whether a compensable taking has occurred. *Id.*

Here, the petitioners argue that "[t]he City's actions have caused the subject property to be under a 'cloud of condemnation' due to years of uncertainty as to the date of acquisition, the amount of land to be acquired

by the City and the access that would be available for any remainder." As a result, they maintain that "the City's actions concerning the development of the [BSP] over an extended period of time rendered [their property] impossible to develop or sell to a developer," effectively taking the property as of April 2004.

 We have not had occasion to address whether prolonged government planning and delayed condemnation proceedings constitute a taking. However, "the weight of authority in other states and in the federal courts [is] that mere plotting and planning by a governmental body in anticipation of the taking of land for public use, and preliminary steps taken to accomplish this, does not, in itself, constitute a taking." *Colorado Springs*, 260 P.3d at 33 (collecting cases); *see Weintraub v. Flood Control District of Maricopa Co.*, 456 P.2d 936, 939 (Ariz. 1969) (noting that "[o]ther jurisdictions have uniformly held that the mere publication of the fact that particular or specified property may be" the subject of a future condemnation proceeding, "or the plotting or planning thereof, is not a taking or damaging of such property entitling the owner to be compensated therefor"). The reasons most frequently cited for this rule are

> that plotting or planning does not, in itself, amount to an invasion of property, or deprive the owner of the use and enjoyment thereof; that the projected improvement may be abandoned and the property never actually disturbed; that the threat or possibility of condemnation is one of the conditions upon which all property is held; and that the rule is in aid of the growth and expansion of municipalities.

Annotation, *Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected*, 37 A.L.R.3D 127, 131 (1971). We find the rationale of these authorities persuasive.

 Undoubtedly, there will be certain circumstances where landowners are "caught in so-called 'precondemnation blight' or 'precondemnation cloud' . . . when the condemning authority . . . engage[s] in aggravating delay or untoward activity in instituting or continuing the condemnation proceedings." *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 708 (Colo. Ct. App. 2010) (quotation omitted). "These situations generally have occurred when cities have adopted urban renewal plans and the condemnation proceedings are protracted." *Id.* "Indeed, a number of jurisdictions have recognized the whole character of an area may be changed to the detriment of the property owner during the course of the proceedings and at times the area has been made a wasteland by the condemning authority." *Id.* (quotations omitted). Nevertheless, we now hold that "damages arising

from protracted delay alone are not compensable and . . . mere plotting and planning do not, without more, amount to an invasion of property or deprive the owner of the use and enjoyment of the property." *Id.* at 710-11.

In this case, the trial court found "that the continuing uncertainty regarding the status of the BSP has [not] been so substantial and prolonged as to rise to the level of a taking of [the petitioners'] property." We agree. "The fact that at some future time land might be taken under eminent domain, even where the threatened taking is imminent, is but one of the conditions on which an owner holds property." *Cayon v. City of Chicopee*, 277 N.E.2d 116, 119 (Mass. 1971) (quotation omitted). While the possibility over a number of years that the petitioners' property may be the subject of a future eminent domain proceeding "might have, as a practical matter, interfered with the marketability of the property, it would cause but an incidental damage which is not compensable." *Id.* (quotation omitted).

In support of their argument that the City's prolonged planning of the BSP constituted a taking of their property, the petitioners rely upon cases from other jurisdictions, most notably *Washington Market Ent., Inc. v. City of Trenton*, 343 A.2d 408 (N.J. 1975), *Lincoln Loan Co. v. State, State Highway Com'n*, 545 P.2d 105 (Or. 1976), and *In re Philadelphia Parkway*, 95 A. 429 (Pa. 1915). However, we agree with the trial court that these cases are distinguishable as they involve "circumstances far more egregious than the matter at hand."

In *Washington Market*, the defendant declared the plaintiff's property, and the surrounding area, "a blighted area" in 1967 as part of an urban redevelopment project that began in 1963. *Washington Market*, 343 A.2d at 410. Approximately ten years later, the defendant abandoned the project and determined that the plaintiff's land would not be taken. *Id.* As a result, the plaintiff brought a takings action, alleging a loss of tenants and an inability to obtain long-term tenants. *Id.* at 409-10. The plaintiff alleged that while it eventually found two temporary tenants, the rent barely met the upkeep expenses. *Id.* at 410. The premises were ultimately sold for taxes. *Id.* at 410 n.3. The court reversed the trial court's grant of summary judgment for the defendant, finding that the plaintiff was entitled to damages if it proved "that there ha[d] been substantial destruction of the value of its property and that defendant's activities have been a substantial factor in bringing this about." *Id.* at 416.

Similarly, in *Lincoln Loan*, the plaintiff owned rental property in an area proposed for a state highway, which the defendant declared necessary for construction of the highway. *Lincoln Loan*, 545 P.2d at 106. The plaintiff alleged that the defendant took property in the vicinity of the plaintiff's property, demolished adjacent buildings and filed condemnation proceed-

ings against the plaintiff's property. *Id.* It further alleged that the defendant "[c]aused notices to be given to tenants that they would be required to vacate the buildings in the area because the defendant was taking them for roadway purposes" and that it "would pay moving expenses and other compensation to tenants if they vacated [the] plaintiff's premises." *Id.* (quotation omitted). Nevertheless, after ten years, the defendant had not condemned the plaintiff's property. *Id.* Consequently, the plaintiff filed an action for inverse condemnation, claiming a loss in the value of the property and "that the rental income from the property was also reduced." *Id.* Ruling on an appeal from a trial court order granting the defendant's motion to dismiss, the Oregon Supreme Court found that the "[p]laintiff ha[d] alleged adequate facts which indicate a substantial interference by the [defendant] with the use and enjoyment of its property." *Id.* at 109.

Finally, in *Philadelphia Parkway*, the petitioner owned property within the lines of a proposed parkway. *Philadelphia Parkway*, 95 A. at 429. In furtherance of the proposed parkway plan, the city took some properties by condemnation, acquired some properties by purchase, tore down certain buildings, began work on parts of the parkway, and took many of the necessary steps toward completion of the parkway over a period of ten to twelve years. *Id.* at 430. The petitioner sought an "appointment of viewers to assess its damages" and the city moved to quash, arguing that until an ordinance to open was passed there had been no taking of the petitioner's property. *Id.*

In reversing the order quashing the petition, the Pennsylvania Supreme Court examined the "long line of cases relating to the laying out, opening, widening, and grading streets, lanes and alleys" that "hold that the mere plotting of a street upon the city plan, without anything more, does not constitute a taking of land in the constitutional sense so as to give an abutting owner the right to have damages assessed." *Id.* The court noted, however, "[t]hat the right to compensation, based upon a taking, may exist in exceptional cases without an ordinance to open" and found that the petitioner's case "belong[ed] to this exceptional class." *Id.* at 431. The court found that the city's actions constituted "a series of unequivocal acts covering a period of years and all evidencing the intention of the city to open and complete the parkway." *Id.* In fact, "at some points the parkway [was] open to public use." *Id.* The court considered the city's actions to be the "equivalent of notice to the property owners that their lands would be appropriated for parkway purposes and that their possession was about to be disturbed." *Id.* Consequently, the court concluded that "under the facts of th[e] case the property of the [petitioner] ha[d] been injured, and what the city ha[d] done constitute[d] a taking in the constitutional sense." *Id.* at 432.

In the instant case, unlike in *Washington Market* and *Lincoln Loan*, there is no evidence that the delay in the BSP threatened the petitioners with a loss of their property due to an inability to pay the taxes or loss of rental income. Moreover, unlike in *Philadelphia Parkway*, the City here did not evince an unequivocal intention to take the petitioners' property for purposes of the BSP. While the City indicated that it *might* take the petitioners' property, its intention and the extent of the possible taking fluctuated with the varying BSP plans.

Citing *Peacock v. County of Sacramento*, 77 Cal. Rptr. 391 (Ct. App. 1969), the petitioners further argue that the trial court's decision failed to account for the unique issues presented by undeveloped land. In *Peacock*, the plaintiffs owned land immediately south of an airport. *Peacock*, 77 Cal. Rptr. at 393. The county adopted an ordinance and rezoned certain property in the area of the airport, effectively frustrating the plaintiffs' economic development of their property. *Id.* at 394-96, 404. The court found that, as a result of the county's actions, the "plaintiffs were deprived totally of the economic use of their property within the 'take' area" which resulted in inverse condemnation. *Id.* at 405. Thus, *Peacock* involved the application of an ordinance and zoning regulations to frustrate and " 'freeze' development of any meaningful kind within the area determined by the court to have been taken." *Id.* at 403. Here, however, as the trial court found, the City had not taken affirmative "steps to prevent [the petitioners] from developing the property."

The petitioners next contend that the trial court erred in choosing 1997 "as the beginning of the process for purposes of the inverse condemnation analysis." They argue that the court "failed to recognize that the beginning date must focus on when the governmental action began to have serious effects on the property rights of the landowner" and that it was the inclusion of the BSP in the 1985 master plan that affected their property rights.

> The trial court, in finding that no taking had occurred, stated that it did not agree with [the petitioners'] suggestion that the seven year period from 1997, when the BSP received federal approval, to 2004, when the claimed *de facto* taking occurred, constituted 'extraordinary delay' rather than normal incidents of ownership attendant upon governmental planning activities for a project as large and complex as the BSP.

While the trial court may have misunderstood the petitioners' argument as being that 1997 was the beginning date for the inverse condemnation analysis, rather than 1985, to the extent that the court itself utilized this date, we find no error.

■ ■ "Although no precise rule determines when property has been taken, the question necessarily requires a weighing of private and public interests." *United States v. 156.81 Acres of Land, Etc.*, 671 F.2d 336, 339 (9th Cir. 1982) (quotation and citation omitted). As evidence that the trial court should have utilized an earlier date for its inverse condemnation analysis, the petitioners point to the inclusion of the BSP in the City's 1985 master plan, "[a] series of nine (9) public hearings and/or meetings between 1985 and 1997 concerning the" BSP, and an early schedule for the BSP, which showed that their "property would be acquired in 1990 or 1991." The record indicates that the BSP was included in the City's master plan in 1985 and, that same year, an environmental impact study was begun. Nevertheless, the EIS was not completed until 1997 and it was not until that year that the BSP was actually approved. Furthermore, the petitioners have failed to articulate in what way the earlier activities "denied [them] worthwhile property rights" so as to constitute a taking. Thus, we hold that the trial court did not err in utilizing 1997 as the beginning date for determining whether a taking occurred.

The petitioners further argue that the trial court erred in "indicat[ing] that the failure to seek approvals for a development on the property was a basis for denying the [petitioners'] inverse condemnation claim." They contend that "[r]uling that an inverse condemnation case cannot prevail without a developer having submitted plans for municipal approval, under the circumstances of this case, cannot find support in the law or in logic."

We conclude that the petitioners' argument misconstrues the trial court's order. The trial court did not rule that an inverse condemnation case cannot prevail unless a developer has submitted plans for municipal approval. Rather, the court distinguished this case from *Peacock* by noting that, unlike in *Peacock*, where the court found that the impact of the county's actions "was to 'freeze' development of any meaningful kind within the area determined" to have been taken, *Peacock*, 77 Cal. Rptr. at 403, here, the petitioners "and any putative purchasers of the property remained free at all times to seek appropriate City approvals for development of the property for any use authorized by the applicable zoning; they simply chose, for whatever reasons, not to do so." Thus, the court did not rule that the submission of development plans is a requirement for demonstrating inverse condemnation.

The petitioners next assert that the trial court "committed reversible error by relying upon the reasonableness of the City's actions, rather than on the effect of the City's actions on the [petitioners'] property rights." Given that we hold, as a matter of law, that the City's actions did not amount to a taking, we need not address this argument.

Finally, the petitioners argue that the trial court committed reversible error by failing to find that a taking occurred where equity, fairness and justice required that the burden imposed by the City should be borne by the public and not the petitioners. They maintain that "[u]nder the circumstances, fairness and justice require that [they] be treated the same as others whose property was in the path of the [BSP]" and "[t]he burden of this unexplained and excessive delay should be borne by the public, not the [petitioners]."

■■ ■■ As stated above, to constitute a taking, the governmental interference "must be sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires that the burden imposed be borne by the public and not by the individual alone." *Sundell*, 119 N.H. at 845 (quotation and ellipsis omitted). In this case, the record demonstrates that the BSP required a substantial amount of planning among various entities prior to its implementation. Similar to the development of an urban renewal area, "[a]n important part of that planning involves disclosure to the community of the proposed . . . action." *Cayon*, 277 N.E.2d at 119. "Undoubtedly, one purpose in . . . such disclosure is to afford community groups and property owners an opportunity to persuade the taking authority to alter its plans." *Id.* Were we to hold that such disclosure and attendant planning of the BSP constituted a compensable taking, this purpose would be frustrated as would the "orderly procedures to be followed in" the planning process. *Id.* at 120; *cf. City of Buffalo v. J.W. Clement Company*, 269 N.E.2d 895, 904 (N.Y. 1971) ("To hold the date of the *announcement* of the impending condemnation . . . constitutes a *de facto* taking at that time, would be to impose an 'oppressive' and 'unwarranted' burden upon the condemning authority" and "so impede the actions of the municipality in preparing and publicizing plans for the good of the community," which would "encourage a converse policy of secrecy . . . ."). Indeed, the BSP could have been abandoned, leaving the petitioners' property undisturbed. *See G & A Land, LLC*, 233 P.3d at 708 (recognizing that "[t]he mere existence of funding and environmental approvals for the project and the issuance of a notice of intent to acquire the property do[es] not automatically result in a de facto taking" because "[a]t that point, the project still could have been abandoned by the condemnor and the property never actually disturbed" (quotation omitted)); *cf. Danforth v. United States*, 308 U.S. 271, 286 (1939) ("The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail."). Based upon these considerations, we hold that the trial court properly declined to rule

that fairness and justice, as between the City and the petitioners, required that any burden imposed be borne by the City.

*Affirmed.*

CONBOY, J., concurred; GALWAY, J., retired, specially assigned under RSA 490:3, concurred.